237 N.J. Super. 342 (1989)
568 A.2d 67
LISBETH HAINES ORGLER, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
HARRY C. ORGLER, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1989.
Decided November 29, 1989.
*344 Before Judges PETRELLA, O'BRIEN and HAVEY.
*345 Irene Rosenberg argued the cause for appellant-cross-respondent (Skoloff & Wolfe, attorneys, Irene Rosenberg of counsel and on the briefs with Francis W. Donahue).
Richard Altman argued the cause for respondent-cross-appellant (Pellettieri, Rabstein & Altman, attorneys, Neal S. Solomon and Deborah A. Rose on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
In this matrimonial litigation defendant, Harry Orgler, appeals from an order which declared invalid an ante-nuptial agreement between defendant and his ex-wife, plaintiff Lisbeth Haines Orgler. Defendant also appeals from the equitable distribution provisions of the divorce judgment as modified by a post-judgment order. Specifically, he challenges the trial court's determination that the pre-marriage value of his businesses and other assets was "zero." He also argues that the trial court erred in not deducting from the value of the marital assets hypothetical taxes he may pay on the future sale of the assets distributed to him. Finally, defendant claims that the $15,600 per year child support is excessive. Plaintiff cross-appeals, challenging those provisions of the judgment and post-judgment order which (1) awarded only 25% of the assets to her; (2) fixed the value of the marital home at $1.6 million; (3) limited the duration of defendant's alimony obligation; (4) denied her request for a lump-sum child support order, and (5) denied her application for counsel and accountant fees.
When the parties first began living together in the summer of 1970, defendant was separated from his first wife. At the time plaintiff was in psychiatric residency at Boston State Hospital in Massachusetts, and defendant held partnership interests in several New Jersey Midas Muffler Shops. He also held interests in various other properties and a pension fund. In October 1970, plaintiff suspended her residency, moved to Paterson to live with defendant, and worked approximately *346 three days a week at defendant's office performing "clerical work."
In July 1972, defendant was divorced from his first wife. On September 7, 1972, plaintiff and defendant entered into an ante-nuptial agreement under which the parties waived their right "in any of the assets which either of the parties owns at the time of ... marriage," to "equitable distribution under N.J.S. 2A:34-23" and to "alimony or support at any future time." The parties agreed that in the event of a divorce, property they had purchased in Hunterdon County would be distributed "in direct ratio" to the investment each made in the property. The agreement also stated that each party "has complete knowledge of any and all assets owned by the other party[,]" has been fully advised on all matters by individual counsel, and ample time had been afforded to each party for full and complete consultation with counsel.
The parties were married on September 9, 1972. Plaintiff thereafter resumed her residency at Rutgers Medical School, earning a salary of $12,000 in 1972. The parties have one child.
Upon the parties' separation in December 1984, plaintiff filed a complaint for separate maintenance and defendant counterclaimed for divorce on the ground of "extreme cruelty." At a plenary hearing conducted as to the enforceability of the ante-nuptial agreement, Monroe Ackerman, Esq., who had represented defendant during the divorce proceedings with his first wife, testified that he discussed preparation of an ante-nuptial agreement with the parties prior to their marriage. He stated that both parties knew "the assets and liabilities which each had." Because plaintiff did not have independent counsel, Ackerman contacted another attorney to represent plaintiff. On September 7, 1972, the parties, with their respective attorneys, met at Ackerman's office, reviewed the agreement and signed it. Ackerman acknowledged he "didn't go into" the parties' assets, and did not attach a list of the assets to the agreement.
*347 Defendant testified that plaintiff, while performing clerical work in his office, was privy to his business dealings and his on-going divorce proceedings with his first wife. He also stated that plaintiff discussed with him her stock holdings worth $100,000, her future potential earning capacity as a psychiatrist, and the prospect that she would receive a "significant inheritance" when her parents died. Defendant claimed it was plaintiff's idea that an ante-nuptial agreement be prepared because plaintiff was "fiercely independent." According to defendant, he and plaintiff each had a net worth of about $100,000 at the time the agreement was signed. However, defendant had fixed his net worth by reference to the "book value" of his business assets, the value utilized during the divorce proceeding with his first wife. He admitted that the fair market value of the assets in 1972 was far in excess of book value.
Plaintiff testified that she met the attorney chosen by Ackerman to represent her for the first time on the day the agreement was signed. It was plaintiff's understanding that defendant was worth approximately $100,000 at the time. She thought that the consequence of the agreement was that she was simply waiving an "automatic 50-50 division of assets," and that waiving of alimony meant only waiving alimony "into perpetuity." As we understand it, plaintiff's assertion is that she did not intend to waive her entitlement to rehabilitative alimony, or alimony if she became disabled or unable to work for any reason. According to plaintiff, her attorney, with whom she consulted for less than one hour, never advised her about her legal entitlement to equitable distribution and possibly to alimony. She did admit, however, that the attorney advised her not to sign the agreement.
In his deposition, entered into evidence, plaintiff's attorney stated he met with plaintiff about an hour before the contract was signed, but did not recall whether "what [plaintiff] was giving up" was discussed.
*348 In concluding that the ante-nuptial agreement was unenforceable, the trial court found:
In the present case, an examination of the evidence respecting disclosure indicated an equivocal situation at best. There is no disclosure by listing of assets. The indications are that defendant did not even know his own wealth and that he understated it realizing that plaintiff would rely on it in entering into the prenuptial agreement. This lack of candor and full disclosure, taken together with the inadequate legal representation and guidance which plaintiff had and her misunderstanding about the legal effect of equitable distribution, all lead this court to conclude that it would be unconscionable to enforce the prenuptial agreement against plaintiff and that it will not be considered in connection with making equitable distribution or support determination in this case.
After a lengthy divorce trial, the trial court fixed the value of the marital assets at $4,038,700. In doing so, the court deducted from value approximately $1.2 million in hypothetical taxes payable upon the future sale of the assets and upon defendant's receipt of his retirement and pension plans. The court included in the marital estate the entire value of defendant's businesses and other assets because, in the court's view, the net value of what defendant owned at the time of the marriage was "zero." The court thereupon distributed 25% of the marital estate ($1,009,675) to plaintiff, and essentially all the remaining assets to defendant. It also ordered defendant to pay alimony for two years in the amount of $25,000 per year and child support in the amount of $300 per week for 20 years. The court then reduced the support and alimony obligation to a lump sum figure and directed that the support, alimony and equitable distribution, totalling $1,266,775, be paid within 60 days.
On motions for reconsideration, the trial court reversed itself and added back into the marital estate for equitable distribution purposes, the sum of $1,220,580, concluding that hypothetical taxes were "incorrectly ... deducted from the fair market values" of the assets. However, the court did give defendant a credit of $167,951 for taxes actually paid for the sale of his business property in Linden. The court also modified the method of paying alimony and support and ordered defendant *349 to pay $50,000 in alimony over three years, and child support of $3,900 payable quarterly until the child is emancipated.
We are satisfied that the trial court's finding that the ante-nuptial agreement was unenforceable is amply supported by substantial credible evidence in the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974); D'Onofrio v. D'Onofrio, 200 N.J. Super. 361, 367 (App.Div. 1985). While ordinarily ante-nuptial agreements fixing post-divorce rights and obligations should be held valid and enforceable,[1]id. at 366, an essential precondition to the validity of such an agreement is
... full disclosure by each party as to his or her financial conditions, including the nature and extent of assets, income, and anything else which might bear on the other party's conclusion that the proposed agreement is fair, and his or her decision to enter into the agreement. [Marschall v. Marschall, 195 N.J. Super. 16, 29 (Ch.Div. 1984)].
Such a requisite finding is bottomed on the equitable principle that for a party to waive a substantial right, there must be "full knowledge of the right and an intentional surrender[.]" West Jersey Title, & c., Co. v. Industrial Trust Co., 27 N.J. 144, 153 (1958).
In the context of an ante-nuptial agreement, the right in question "can properly be considered `known' only if there is full awareness of the other party's income and assets, since those facts are critical elements in determining the potential awards of alimony and equitable distribution which the signer of the agreement is being asked to `waive.'" Marschall v. Marschall, supra, 195 N.J. Super. at 32. The "easiest device" to evidence such knowledge is by annexing to the agreement a list of assets and their approximate values. Id. at 33.
Here, the parties appended no schedule of their respective assets to the agreement. While plaintiff was aware that defendant *350 was a man of some wealth, she had no idea what defendant's true net worth was when the ante-nuptial agreement was signed. Defendant admitted using "book value" in establishing the value of his assets during the settlement of the divorce proceedings with his first wife. Indeed, defendant did not know the fair market value of his business holdings when the agreement was executed.
There is also ample evidence that plaintiff did not understand the concepts of equitable distribution and alimony. This misunderstanding no doubt was due at least in part to the fact that her attorney, with whom she met for one hour on the day the agreement was signed, did not advise her regarding the intricate factors involved in equitable distribution, or of her potential entitlement to rehabilitative or even permanent alimony. The attorney's advice not to sign the agreement could not be meaningful without plaintiff's knowledge of defendant's true financial worth and an understanding of the concepts of equitable distribution and alimony. Moreover, the mere conclusory clause in the agreement, that the parties had "complete knowledge of any and all assets owned by the other party," must be deemed insufficient in view of the trial court's supportable finding that defendant failed to make a full and complete disclosure of his financial worth. See DeLorean v. DeLorean, 211 N.J. Super. 432, 438 (Ch.Div. 1986). In short, we agree with the trial court that plaintiff did not make a knowing and intelligent waiver of these substantial legal rights since she was not fully informed of all essential facts.
Defendant next argues that if the ante-nuptial agreement is unenforceable, the trial court erred in concluding that the value of his premarital assets was "zero." We agree.
For an asset to be subject to equitable distribution, it must be "property ... legally and beneficially acquired by [the parties] or either of them during the marriage." N.J.S.A. 2A:34-23. Thus, it is settled that property owned by the parties at the time of the marriage remains the separate *351 property of each spouse and, in the event of divorce, will not qualify as an asset eligible for distribution. Painter v. Painter, 65 N.J. 196, 214 (1974). However, enhancement in value of a spouse's premarital asset occurring after the marriage is subject to equitable distribution to the extent the increase is attributable to the efforts of the other spouse. See Scherzer v. Scherzer, 136 N.J. Super. 397, 400-401 (App.Div. 1975), certif. den. 69 N.J. 391 (1976). The burden of establishing that an asset is immune from equitable distribution "will rest upon the spouse who asserts it." Landwehr v. Landwehr, 111 N.J. 491, 504 (1988), quoting Painter v. Painter, supra, 65 N.J. at 214.
Here, there is no question that defendant owned Midas Muffler Shops and other properties, and held interests in corporate pension and retirement funds at the time of the parties' marriage. During the divorce trial, defendant's experts established that Midas Muffler Shops were generally purchased and sold according to a formula based on a percentage of the gross sales for the 12 months preceding the purchase. Applying the formula, the experts fixed the premarital value of the shops at approximately $600,000. Defendant himself testified that his share in his pension and retirement plans approximated $25,000 at the time of marriage. Plaintiff presented no countervailing proof as to the value of defendant's assets as of the date of the marriage. Clearly these assets had some premarital value. The trial court failed to consider these values in performing the requisite analysis under Rothman v. Rothman, 65 N.J. 219, 232 (1974): determining what properties are eligible for distribution, fixing the value of those assets, and deciding how allocation can most equitably be made.
We therefore remand with direction that the premarital value of these assets be fixed and deducted from the marital estate for equitable distribution purposes. The court, of course, is not precluded from marshalling additional proofs to fix a value, if necessary, see Bowen v. Bowen, 96 N.J. 36, 43 (1984), including the appointment of its own expert pursuant to R. 5:3-3(b).
*352 Defendant next argues that the trial court erred in refusing to deduct from the value of the marital estate $1.2 million in hypothetical taxes, payable upon the future sale or transfer of the marital assets distributed to him.
Our Supreme Court in Painter v. Painter, supra, 65 N.J. at 212-213, held that "it will not be improper for a judge to give appropriate heed to legitimate tax considerations ... where the most equitable disposition of property interests can thereby be best attained." See also N.J.S.A. 2A:34-23.1j. Again, in Dugan v. Dugan, 92 N.J. 423, 441 (1983), the court concluded that, in the context of evaluating the husband's good will in a professional corporation, "potential federal tax consequences should be considered in determining equitable distribution." Neither Painter nor Dugan distinguish the immediate tax consequences of an equitable distribution order from future hypothetical taxes that may be incurred if and when the distributed assets are sold or transferred.[2]
In Stern v. Stern, 66 N.J. 340, 348 (1975), the court declined to deduct prospective taxes from the value of a husband's partnership's accounts receivable, noting that the value of the asset "is in no way diminished by the fact that defendant may thereafter be called upon to pay an income tax resulting in substantial part from his receipt of income from the partnership."
*353 New Jersey courts addressing "legitimate tax considerations," Painter, supra, 65 N.J. at 212, do so in the context of actual, ascertainable taxes incurred as a result of distribution. For example, in Callahan v. Callahan, 142 N.J. Super. 325, 331 (Ch.Div. 1976), the Chancery Division, "without expressing any opinion on ... tax consequences," granted to plaintiff-wife ownership of her ex-husband's stock options, and directed that "if the transfer of the ... stock to plaintiff ... results in tax liability to defendant, she shall save him harmless from such liability." See also Lynn v. Lynn, 153 N.J. Super. 377, 387 (Ch.Div. 1977), rev'd on other grounds, 165 N.J. Super. 328 (App. Div.), certif. den. 81 N.J. 52 (1979) (marital assets transferred to trustee, "who shall reimburse both parties `off the top' for any income taxes each must pay thereon").
In the context of distributing a husband's military retirement pension, we held in Kruger v. Kruger, 139 N.J. Super. 413, 421-422 (App.Div. 1976), modified on other grounds 73 N.J. 464 (1977) that
... there must be a recognition of the fact that treatment of retired pay and disability benefits . .. may impose an inequitable income tax burden upon the husband who would, in effect, be compelled to pay the income tax on the wife's distributive share of the regular payments.
We therefore directed that an award of equitable distribution should provide for "distribution to the wife of a share of only the net pay, that is, after deduction of the federal income taxes...." Id. 139 N.J. Super. at 422. However, in Kruger, the husband was already receiving the benefits at the time of trial and therefore the court was not required to speculate as to tax consequences. See id. at 415.
Out-of-state cases are virtually unanimous in holding that hypothetical taxes should not be deducted from the value of the marital assets. For example, the California Supreme Court in In re Fonstein, 17 Cal.3d 738, 552 P.2d 1169, 131 Cal. Rptr. 873, (Sup.Ct. 1969), held that the trial court erred in deducting hypothetical taxes against the value of the husband's interest in *354 his law partnership which he had received as part of a community property distribution. The court reasoned:
... the court is not required to speculate about what either or both of the spouses may possibly do with his or her equal share and therefore to engraft on the division further adjustments reflecting situations based on theory rather than fact.
........
Regardless of the certainty that tax liability will be incurred if in the future an asset is sold, liquidated or otherwise reduced to cash, the trial court is not required to speculate on or consider such tax consequences in the absence of proof that a taxable event has occurred during the marriage or will occur in connection with the division of the community property. [Id. at 17 Cal.3d at 749, 552 P.2d at 1176, n. 5, 131 Cal. Rptr. at 879].
Similarly, in Hovis v. Hovis, 518 Pa. 137, 140, 541 A.2d 1378, 1380 (Pa.Sup.Ct. 1988), the Pennsylvania Supreme Court recently concluded that the potential tax consequence on a husband's future withdrawal of pension funds and redemption of corporate stock upon his retirement was too speculative to deduct from the value of the marital assets. The court reasoned:
Additionally, if Mr. Hovis decides not to retire at age sixty-five and continues to work until, say, the age seventy or seventy-five, the trial court would be unable to reasonably predict what his future tax liability would be because tax rates constantly change. [Footnote omitted]. Consequently, a present deduction from the value of a marital asset for future tax liability that cannot reasonably be calculated and, in fact, may never be imposed could result in a windfall to Mr. Hovis and a corresponding disadvantage to Mrs. Hovis. [Id. 518 Pa. at 140, 541 A.2d at 1380].
In like manner, the Montana Supreme Court in Beck v. Beck, 631 P.2d 282, 285 (Mont.Sup.Ct. 1981), held that where a property distribution includes a taxable event precipitating an immediate tax liability, such liability should be considered by the court before entering final judgment. However, the trial court does not abuse its discretion by refusing to consider "theoretical tax consequences when the court-ordered property distribution does not contemplate any taxable event which triggers present tax liability." Ibid. Accord Goldstein v. Goldstein, 120 Ariz. 23, 25, 583 P.2d 1343, 1345 (Sup.Ct. 1978); Burkhart v. Burkhart, 169 Ind. App. 588, 592, 349 N.E.2d 707, 711 (1976); Fick v. Fick, 375 N.W.2d 870, 874 *355 (Minn. Ct. App. 1985); Nemitz v. Nemitz, 376 N.W.2d 243, 248-249 (Minn. Ct. App. 1985), and Carpenter v. Carpenter, 657 P.2d 646, 656 (Okla. 1983).
We adopt as sound the common theme found in each of these out-of-state cases, that hypothetical tax consequences upon the future sale or transfer of marital assets should not be deducted from present value for equitable distribution purposes. The hypothetical tax is simply too speculative to permit a reduction in value. It is akin to the potential brokerage commission on the future sale of a marital home, a deduction we disallowed in Wadlow v. Wadlow, 200 N.J. Super. 372, 383-384 (App.Div. 1985), as being a "speculative cost of a speculative sale." There may be no sale or transfer of the asset at all during the ex-spouse's lifetime. At the time of the ex-spouse's death, the basis of the asset will be stepped-up to the fair market value of the property. See 26 U.S.C. § 1014(a).
Further, the ex-spouse may defer sale or transfer until tax shelters are available, or avail himself or herself of the $125,000 exemption on the sale of the marital home upon reaching the age of 55. See 26 U.S.C. § 121 and Louis, Consideration of Theoretical Tax Consequences in Equitable Distribution, 8 N.J.Fam.Law. 153, 155 (1989). If the asset is sold, the tax will depend on the then applicable tax rate and the ex-spouse's tax bracket. In short, deduction of hypothetical taxes from present value frustrates the trial court's basic function to assure that "the most equitable disposition of property interests... be ... attained." Painter v. Painter, supra, 65 N.J. at 213.[3]
*356 However, the tax consequences resulting from a court-ordered sale of marital assets, or of a contemporaneous sale of assets by an ex-spouse necessary to meet his or her equitable distribution obligation, is not speculative at all. In such a circumstance, the ex-spouse is able to demonstrate the present tax consequence. Further, distribution of the net value in such a circumstance best attains an equitable distribution of the asset. See Kruger v. Kruger, supra, 139 N.J. Super. at 422.
Although hypothetical tax consequences should not reduce the present value of marital assets, such a consideration, as recognized by Painter, has an important place in the equitable distribution process. The distinction is recognized in Stern:
The value of the latter asset is in no way diminished by the fact that defendant may thereafter be called upon to pay an income tax resulting in substantial part from his receipt of income from the partnership. The fact that [the husband] will pay a tax on [accounts receivables] may be a relevant consideration when considering whether a distribution is equitable and it is clearly relevant with respect to the determination of alimony, but it does not affect the value of defendant's interest in the law firm. [66 N.J. at 348, emphasis supplied].
Thus, the hypothetical tax consequence, presumably fixed by competent expert testimony, is a factor to be considered with all other factors, such as the respective earning capacity of the parties, their health, education and contribution to the marriage, in determining the distributive share of each party. See Louis, supra, 8 N.J.Fam.Law. at 157.[4]
Here, defendant's prospective tax on the sale of the marital home and his businesses is speculative. In his brief in opposition to plaintiff's motion for reconsideration, defendant asserts that the hypothetical taxes were "reasonably foreseeable," but admits that the "actual tax is impossible to determine at the *357 present time." There was no persuasive evidence presented to the trial court that defendant is presently compelled to sell any of the assets in order to pay plaintiff's share of the equitable distribution. We find no abuse of discretion in the trial court's refusal to deduct the hypothetical taxes from present value.
We also conclude that, at least on the facts before us, the trial court did not abuse its discretion by refusing to deduct hypothetical taxes from the value of defendant's pension and retirement fund. Unlike Kruger, where the tax on the pension was readily ascertainable because the husband was already receiving pension payments, here defendant was several years from retirement at the time of trial. The facts do not indicate when he will receive the retirement funds, but we do know that defendant's plans are controlled by him, and either a lump-sum distribution or a five-year forward averaging is possible when the funds are received. Availability of tax shelters and other income when defendant receives the funds renders the prospective tax too speculative to deduct from the value of the plans.
As stated, the hypothetical tax, while not deducted from the present value of the assets, should have been considered as a factor in determining the distributive share of each party. It may well be that the trial court did consider this factor in fixing the 75%-25% distribution of the assets. However, the court did not so state in making its findings. Therefore, on remand, the court should articulate its application of the Painter criteria, including potential tax consequences, in making its equitable distribution award.[5]
On plaintiff's cross-appeal, she contends the trial court "acted arbitrarily and against the weight of the evidence" in *358 fixing the value of the marital home at $1.6 million. Plaintiff's real estate appraiser estimated the marital residence at $2.5 million. Defendant's appraiser set the value at $1.3 million. The trial court, without comment or analysis of the expert testimony, determined that the fair market value of the home was $1.6 million.
It is important that a trial court make specific findings, particularly when faced with a complex financial valuation question, so that the parties and reviewing court may be informed of the rationale underlying the court's conclusion. Esposito v. Esposito, 158 N.J. Super. 285, 291 (App.Div. 1978). Here, without the appropriate fact-finding, we are unable to determine whether the $1.6 million valuation fixed by the court is supportable. We therefore remand for additional fact-finding and proofs, if necessary, in fixing the value of the marital home.
We are satisfied that the remaining contentions raised by both parties are clearly without merit. R. 2:11-3(e)(1)(E). Our review of the record satisfies us that the trial court's allocation of only 25% of the marital assets to plaintiff was not an abuse of discretion. See Borodinsky v. Borodinsky, 162 N.J. Super. 437, 444 (App.Div. 1978). Further, the order fixing the amount and duration of alimony and support is fully supportable. Lepis v. Lepis, 83 N.J. 139, 155 (1980); Khalaf v. Khalaf, 58 N.J. 63, 67 (1971); Dunne v. Dunne, 209 N.J. Super. 559, 566 (App.Div. 1986). Finally, denial of plaintiff's application for counsel and accountant's fees was not an abuse of discretion. Williams v. Williams, 59 N.J. 229, 233 (1971); Pascarella v. Pascarella, 165 N.J. Super. 558, 565 (App. Div. 1979). No costs or attorney's fees shall be awarded to either party on this appeal.
Affirmed in part, reversed in part. The matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] Since the ante-nuptial agreement here was executed in 1972, the "Uniform Premarital Agreement Act," N.J.S.A. 37:2-31 et seq., enacted August 5, 1988, is inapplicable. See N.J.S.A. 37:2-41.
[2] The United States Supreme Court in 1962 held that a transfer of appreciated property as part of equitable distribution under Delaware law was a taxable event. U.S. v. Davis, 370 U.S. 65, 70-72, 82 S.Ct. 1190, 1193-1194, 8 L.Ed.2d 335, 341-342, reh. den. 371 U.S. 854, 83 S.Ct. 14, 15, 9 L.Ed.2d 92 (1962). In 1984, the Internal Revenue Code was amended to provide that no gain or loss shall be recognized on a transfer of property incident to a divorce from an individual to his or her spouse. 26 U.S.C. § 1041(a). However, the gain is not forgiven, but simply deferred, and thus the spouse receiving the assets will be subject to a future tax upon sale or transfer of the property. See Ulrichsen, Latent Tax Consequences in Equitable Distribution, 6 N.J.Fam.Law., 7, 7-8 (1986).
[3] Defendant cites the Statement of Provision given by the American Institute of Certified Public Accountants in support of his argument that the value of marital assets must be adjusted for hypothetical taxes. However, the statement is utilized in the preparation of personal financial statements. Because assets may have appreciated since the acquisition, values are to be shown as if assets were sold on the day the personal financial statement was prepared. The statement is not directly applicable to a divorce proceeding where the court is called upon to make equitable distribution based on a variety of factors.
[4] Recently the Supreme Court in Moore v. Moore, 114 N.J. 147, 162 (1989), held that the speculative nature of post-retirement cost of living increases on a pension did not exclude the increases from equitable distribution. Moore dealt with whether an asset should be included in the marital estate, not the manner by which the asset, as here, should be valued. We therefore do not read Moore as supportive of defendant's argument that hypothetical taxes must be deducted from the present value of the marital assets.
[5] Also, on remand, the trial court should address apparent discrepancies between its findings and the evidence presented on the motions for reconsideration regarding the amount of cash in bank accounts the parties held as of the date the complaint was filed, as well as the question whether defendant is entitled to a credit for plaintiff's Princeton Bank account and money market fund.