252 N.J. Super. 635 (1991)
600 A.2d 512
UNI BERRIE, PLAINTIFF-APPELLANT,
v.
RUSSELL BERRIE, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1991.
Decided December 31, 1991.
*637 Before Judges DREIER, GRUCCIO and BROCHIN.
Joel D. Siegal argued the cause for appellant (Hellring, Lindeman, Goldstein & Siegal, attorneys; Joel D. Siegal, Ronny J.G. Siegal and Sheryl E. Koomer, on the brief).
Frederic K. Becker argued the cause for respondent (Wilentz, Goldman & Spitzer, attorneys; Frederic K. Becker, David M. Wildstein, Frederick J. Dennehy, Christine D. Petruzzell, and Douglas K. Schoenberg, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff, Uni Berrie, appeals by leave granted from interlocutory rulings in favor of her husband, Russell Berrie, by two trial judges. The orders were entered on December 20, 1990 and January 31, 1991. In response to defendant's successful in limine motion, the initial trial judge ruled in the December 20, 1990 order:
This court rules in limine that a premarital period of cohabitation does not extend coverture for equitable distribution purposes, and, any increase in the value of defendant's stock in Russ Berrie & Company, Inc. during any premarital period of cohabitation is not subject to equitable distribution.
This court rules in limine that defendant's stock in Russ Berrie & Company, Inc. is a passive premarital asset and is not subject to equitable distribution. This court further rules that any increase in value of that stock from the date of the marriage until the date of filing of the complaint is not subject to equitable distribution.
No evaluation of Russ Berrie & Company, Inc. is necessary to this litigation.
*638 The order continued, stating that plaintiff was denied funds to retain an expert to value the corporate stock, and that no court-appointed expert would be designated to value the stock.[1]
The judge explained his reasoning in a nine page letter opinion dated October 3, 1990, which he incorporated by reference into the December order. In this opinion the judge traced the origin and growth of defendant's business. Defendant founded the business in 1963, twenty years prior to the parties' marriage. It was initially a one-man operation producing "impulse gift products" (stuffed animals and other small items marketed through card shops). After incorporation in 1966, the business grew and defendant developed his own product line, expanding in personnel and producing more income. By the time the parties met in 1979, while both were married to other individuals, the company, in the trial judge's words,
was a multinational, multimillion dollar corporation. It had decentralized into separate autonomous departments which were located in several areas within this country and also in other areas of the world including the Far East. The various departments included sales, distribution, product development, administration and finance. The company's basic product line had been fully established and the company had over 1,000 employees and over 100 managers.
The parties met by chance on a flight from Hong Kong to Seoul. Plaintiff is Korean by birth, but at that time she was a United States citizen who was separated from her first husband. After sporadic contacts during the initial months of their relationship, defendant requested that plaintiff leave her home and family in Korea and come to United States with him. Plaintiff alleges that there had been premarital promises made to her by defendant. In the words of the amended complaint:
defendant promised and declared to plaintiff that he would take care of her and support her for the rest of her life, that he would provide for her future financial security and that she would share in all the assets and property that was accumulated.
*639 At the end of 1979 defendant purchased what was to be the marital home in Englewood. Some time between early 1980 and mid-1981 they lived together in the home. According to plaintiff, defendant insisted that plaintiff seek no financial settlement from her former husband and defendant retained the attorney and supervised the securing of her initial divorce.
Plaintiff was divorced from her former husband on December 3, 1981; defendant was divorced from his former wife on December 10, 1983. The parties were married on December 29, 1983. At that time they already had a daughter who was nearly two years old. Their premarital relationship can be expressed by quoting defendant's own words, taken from a certification dated April 7, 1983 filed in connection with his divorce from his former wife:
The defendant [Kathy Berrie, Russell Berrie's former wife] refers to my single `girlfriend'. The fact of the matter is that this girlfriend is the woman whom I love, who is the mother of my child, whom I respect and to whom I am married morally and spiritually, and with whom I shall be married legally as soon as the litigation [defendant's divorce from Kathy Berrie] is terminated. We have lived together for the past three years, and she not only has been emotionally supportive of me, but has helped me in my work. Her assistance in my business has been tremendous, since we import a great deal of our merchandise from Korea, and her understanding of Korean commercial customs, as well as her fluency in that language, have been tremendous assets to me.
* * * * * * * *
[M]y present relationship is a significant one, ... in which we are the parents of a lovely child and which brings to us all the joys of honorable married life.
* * * * * * * *
I am, in every sense of the word, happily married to another woman and joyfully engaged in a truly honorable married life....
[M]y relationship with the woman I love is one which does not depend on material things for joy. We work together, shoulder to shoulder, both in the home and in our business, with a deep and abiding concern in the values of our marriage....
After March 1980 plaintiff began working for the company as a *640 Korean liaison officer.[2] At the time one-half of the company's products were manufactured in Korea; by 1989, 94% of the products were manufactured there or elsewhere in Asia.
In a 1981 deposition, defendant described the company's value in December 1980. Defendant stated: "I would have said to you if somebody came along and would give me $1,000,000, I'd take it and run." Ten months later, defendant stated that the company was still "trying to do well," but that the business could "fall by the wayside" if defendant did not continue his intensive involvement. In fact, he did not know whether he was going to "meet next months' bills."
However, the situation improved, and after the birth of the parties' daughter in March 1982, defendant changed his previously-expressed opposition to taking the company public. According to plaintiff, defendant changed his mind in order to provide their daughter with security. The ground work was performed, and the company elected to go public in the spring of 1984, three months after the parties' marriage.
One problem in this case, discussed in more detail later, is the value of approximately 8,000,000 shares (53.1%) of the corporation's stock retained by defendant. This stock was not registered in the public offering and is a control block. Between 1984 and 1989 defendant's ownership of the corporation was reduced from 86% to 53.1%. At the time defendant filed a Preliminary Disclosure Statement on August 29, 1983 in his *641 prior divorce, he certified that the value of his company was $9,489,143.[3] The stock actually was first offered to the public on March 29, 1984, at a market price of $14 per share. As noted by the trial judge, the publicly held stock has fluctuated from $13.88 a share to $47.75 a share. When the complaint was filed, the market price of the stock was $18.12 a share, and in December 1989 it was $14.50 a share. At the time of the trial judge's letter opinion, defendant held the position of Chief Executive Officer of the company which employed 2,300 workers, 800 salespersons and 200 managers, with five subsidiaries, 12 distribution centers and a worldwide market.
The trial judge very properly noted that substantial assets of the parties are available for equitable distribution, such as their jointly-owned marital home valued at $17,000,000 and a condominium in Florida valued at $1,200,000. Also, plaintiff owned $760,000 worth of securities in her own name as well as $500,000 in jewelry and $100,000 in furs. In addition, certifications, including those of her own sister, averred that plaintiff maintained a sizeable cash reserve in at least one safety deposit box. The children are well protected with three inter vivos trusts.
Since we are here reviewing the results of an in limine order made prior to discovery and based upon conflicting allegations of fact, we must assume that the facts presented by plaintiff are accurate or would have been developed by the discovery she has sought. In limine motions have their place where issues can be eliminated as a matter of law prior to trial. See Evid.R. 8(1). Where, however, the decision on the in limine motion itself requires an analysis of evidence yet to be presented or credibility determinations, such motions should *642 ordinarily be denied until a sufficient predicate is established. Bellardini v. Krikorian, 222 N.J. Super. 457, 464, 537 A.2d 700 (App.Div. 1988); State v. Polito, 146 N.J. Super. 552, 558, 370 A.2d 478 (App.Div. 1977). Our analysis here therefore is not too different from a review of a motion for partial summary judgment, see R. 4:46-2, but with the claim limited to a matter encompassed in an order rather than a judgment.
Defendant sought to have the trial and discovery shortened by eliminating all references to the value of his business, which he considered a premarital asset not subject to equitable distribution. If he were correct, an in limine motion would be the correct procedural vehicle to shorten the trial. In this case, however, there are sufficient unique circumstances and disputed facts that made the granting of this motion inappropriate, or at least premature. This is not a case involving, for example, a party entering into a marriage with a portfolio of marketable securities managed by a brokerage house, and where there is a divorce many years later after the securities had increased tenfold. By statute, N.J.S.A. 2A:34-23 (last paragraph), and under case law, Painter v. Painter, 65 N.J. 196, 214, 320 A.2d 484 (1974), such assets would be exempt. In such a case, extensive discovery concerning the value of the assets, portfolio changes and the like could be obviated by an in limine motion to exclude the assets and to limit discovery.
In this case, however, although the corporation is public, defendant holds approximately 8,000,000 unregistered shares. Defendant has publicly and repeatedly stated that he controls the company.[4] We need not recount the numerous references *643 in public announcements and corporate materials stating that defendant is the force behind the corporation, notwithstanding the abundance of employees.
New Jersey case law has not differentiated between the corporate and non-corporate form in determining whether a business is subject to equitable distribution. See Scherzer v. Scherzer, 136 N.J. Super. 397, 400, 346 A.2d 434 (App.Div. 1975), certif. denied, 69 N.J. 391, 354 A.2d 319 (1976). Yet defendant contends that the fact that the company is a public corporation precludes consideration of whether the unregistered corporate stock held by defendant is other than a passive asset subject only to the vagaries of the stock market. We cannot accept this proposition, especially when based upon such a meager record, devoid of any proof of how a control block of unregistered stock is treated by the financial community.
Defendant further suggests that in no case can one person's effort be determinative of the value of a public corporation. We reject this thesis. There is no question that a single person's effort can influence the growth and success of a sole proprietorship, joint venture, partnership or a close corporation. As the organization grows, however, the question becomes more one of fact, depending upon how closely the individual is identified with the business entity. The issue becomes intertwined with the valuation of the entity's good will, which is itself equitably distributable in an appropriate case. Bowen v. Bowen, 96 N.J. 36, 47, 473 A.2d 73 (1984); Dugan v. Dugan, 92 N.J. 423, 434, 457 A.2d 1 (1983); Stern v. Stern, 66 N.J. 340, 346-347, 331 A.2d 257 (1975). For example, although a junior partner or shareholder in a law firm may share in the firm's good will, his or her presence or absence in the firm would not materially change the overall value of the good will. Yet, the good will of a law firm operated as a sole proprietorship with *644 several associates may be completely dependent upon the firm's principal.
This is true for a commercial corporation as well; and the fact that such a corporation is publicly held should not change this analysis. The efforts expended by the principal or even his or her mere presence may cause a willing buyer to pay more for the stock. While expert testimony most probably would be necessary to determine the effect of the individual upon the value of the stock, the fact that market forces might combine with such effect to control the price of the stock does not eliminate the factors relating to the individual. Each can be analyzed separately, one as a passive factor, the other as an active factor. As such corporations mature, the influence of the individual may decrease so that the corporation could survive even his passing without a devastating financial effect. Yet until that point is reached, expert analysis is admissible to show the effect the individual may have upon the value of a corporation.
The trial court on remand must first determine whether the stock held by defendant is unlike the managed portfolio described earlier, and is in fact, an active asset, the increased value of which would have been subject to distribution from and after the date of the parties' marriage. If this is so, the central issue in this case will be whether all or any part of the premarital cohabitation period can be considered in determining the base from which any such increase will be measured.
Plaintiff initially sought equitable distribution measured from the date of the commencement of cohabitation. However, in the order of January 31, 1991, also appealed from here, a second judge determined that the complaint should not be amended to add other equitable and contractual causes of action, specifically, a resulting trust; a constructive trust; quantum meruit recovery; unjust enrichment and quasi-contractual recovery; "transmutation;" implied contract; and express contract. The second judge determined that as a matter *645 of law "any alleged equitable or contractual rights and obligations the parties may have had arising from their relationship prior to their marriage ended with their marriage contract unless specifically reserved or agreed upon by the parties." He also viewed the opinion of the judge who determined the in limine motion as effectively removing the corporate stock from consideration and effectively precluding any inclusion of the stock under any new legal theory.
Initially, we note this is a case of first impression insofar as the premarital asset sought to be distributed is other than the marital home. See Weiss v. Weiss, 226 N.J. Super. 281, 284-289, 543 A.2d 1062 (App.Div. 1988), certif. denied, 114 N.J. 287, 554 A.2d 844 (1988), and the cases there cited. In Weiss, Judge Skillman reviewed the cases acknowledging that a premarital asset such as the marital home might trigger a right of equitable distribution prior to the marriage ceremony. The court started its analysis with Painter v. Painter, 65 N.J. 196, 320 A.2d 484 (1974), and the Supreme Court's interpretation of N.J.S.A. 2A:34-23 as it focused upon the period between the date of the marriage and the date the divorce complaint is filed. 226 N.J. Super. at 286-287, 543 A.2d 1062. Judge Skillman further noted, however, that the dictum in Painter (that the words "during the marriage" commenced the period "as soon as the marriage ceremony has taken place," 65 N.J. at 217, 320 A.2d 484) is tempered by a cautionary footnote. He stated:
"However, the Court in Painter further indicated that its comments should not be understood to `provide certain and ready answers to all questions which may arise as to whether particular property is eligible for distribution' and that `[i]ndividual problems must be solved as they arise, within the context of particular cases.' 65 N.J. at 218, n. 7 [320 A.2d 484]. Furthermore, the cases decided since Painter have recognized that N.J.S.A. 2A:34-23 should be construed, to the extent feasible, to effectuate the public policy underlying the equitable distribution law, which is to recognize that marriage is `a shared enterprise, a joint undertaking, that in many ways ... is akin to a partnership.'" Smith v. Smith, supra 72 N.J. [350] at 361 [371 A.2d 1] [1977], quoting Rothman v. Rothman, supra 65 N.J. [219] at 229 [320 A.2d 496] [1974].
Weiss, 226 N.J. Super. at 287, 543 A.2d 1062. This court concluded in Weiss that

*646 a date prior to the marriage ceremony can, in appropriate circumstances, qualify as the date of commencement of the marriage for the purpose of deciding whether property is a marital asset subject to equitable distribution. Just as the Painter line of cases has recognized that the marital partnership may terminate prior to the entry of a judgment of divorce, we believe that for the purpose of triggering a right of equitable distribution a marital partnership may be found to have commenced prior to the marriage ceremony, where the parties have adequately expressed that intention and have acquired assets in specific contemplation of their marriage. This conclusion recognizes that the `shared enterprise' of marriage may begin even before the actual marriage ceremony through the purchase of a major marital asset such as a house and substantial improvements to that asset.
226 N.J. Super. at 287, 543 A.2d 1062.
While defendant seeks to confine Weiss and the earlier trial court and out-of-state decisions cited in Weiss, id. at 288, 543 A.2d 1062, to an early purchase of a marital home, we see no such limitation in Weiss, nor would we express the same here. Yet, we do not lose sight of the two requirements expressed in Weiss for there to be such a premarital "partnership:" First "where the parties have adequately expressed that intention," and second, where the parties "have acquired assets in specific contemplation of their marriage." Id. at 287, 543 A.2d 1062. The "intention" described in Weiss is not an intention to marry, but rather to create "a marital partnership ... prior to the marriage ceremony" (ibid.) with respect to the particular property, i.e., the equivalent of a business partnership.
Furthermore, we see no reason on this record to reject as a matter of law the application of Weiss to the purchase of a new asset. If the parties by their combined efforts work as part of this "partnership" to increase the value of an asset held by one of them, such increase in value under established principles also might be subject to treatment as a partnership interest, which in turn might be subject to equitable distribution. Cf. Weiss, 226 N.J. Super. at 290, 543 A.2d 1062, and cases there cited. Plaintiff points to the certification of defendant himself, quoted earlier, as a definitive statement that the parties here had commenced such a marital "partnership" prior to their marriage ceremony. These facts, however, were not examined by *647 the trial judge since he rejected the legal basis for their consideration.
We must also consider the second element noted in Weiss, namely that the assets be "acquired [or, as here, enhanced] in specific contemplation of [the] marriage." Id. at 287, 543 A.2d 1062. Several sub-issues need to be resolved. If plaintiff were merely employed by defendant, receiving a full salary for her efforts, it might be argued that the enhancement of the company was not a partnership enterprise in contemplation of the marriage, but was merely a job.
In Coney v. Coney, 207 N.J. Super. 63, 503 A.2d 912 (Ch.Div. 1985), property had been purchased in the wife's name alone prior to the marriage, since the husband's divorce was not yet final. The husband physically helped build the house on the property and the couple, together with the wife's children by a prior marriage, lived in the house for several years after which the parties married. After another seven years of residence, she filed for divorce. Judge Gladden there differentiated between three types of property: nonmarital property brought to the marriage by one party, where only the enhanced value after the date of marriage can be considered; cohabitation property, where the parties never marry, but traditional equitable principles can be applied to effect a division; and premarital property where "one or both marital parties acquired either personal or real property jointly[5] and made contribution to the same before marriage." 207 N.J. Super. at 73, 503 A.2d 912. Judge Gladden determined that the same equitable principles had permitted the enforcement of the "palimony" contract in Kozlowski v. Kozlowski, 80 N.J. 378, 384, 391, 403 A.2d 902 (1979), permitting an award to the husband for the premarital increase in value of the property, notwithstanding his lack of title.
*648 We cannot on this record determine whether plaintiff is entitled to participate in the increased value of the corporation for all, a portion, or none of the period of cohabitation prior to the marriage. She has presented her view of the case, but discovery, limited by the trial judges' rulings, has failed to yield a complete picture of the parties' relationship with respect to the corporation. Defendant's certification filed at the time of his initial divorce is eloquent in praise of plaintiff, and her role in his life. Other statements establish her worth to the corporation, both as to personal efforts and to her maintaining a family home to which defendant could repair after bouts of working 24 hours per day. If equitable distribution is to be granted for all or any parts of this period in some percentage, defendant must be permitted to state his case (which was unnecessary in view of the courts' rulings), and plaintiff to augment hers, all after adequate discovery.
Even if some theory of equitable distribution is not viable, we see no reason why plaintiff should be precluded from presenting her various alternative theories of recovery. R. 4:9-1 requires that an amendment to pleadings "be freely given in the interest of justice." Carr v. Carr, 120 N.J. 336, 350-353, 576 A.2d 872 (1990), in a different setting, outlines the various theories in addition to equitable distribution which may be available to one spouse seeking distribution of the other's property. The amended complaint should now be filed so that discovery as it progresses can focus on the bases for such theories.
While we have concluded that plaintiff's claim should not have been precluded as a matter of law on this limited record, we do not by our remand wish to suggest to the trial judge that either plaintiff's or defendant's positions need be accepted. Additionally, if plaintiff's claim to some form of distribution is accepted, we do not wish to suggest to the trial judge what percentage should be accorded her for the marital period or, if a premarital period is added, whether the same percentage should *649 be adjudged for all or any portion of the period of cohabitation. In any final decision, the court must make specific findings, especially when faced with such a complex question of financial valuation. See Orgler v. Orgler, 237 N.J. Super. 342, 358, 568 A.2d 67 (App.Div. 1989). A decision which is made upon "conflicting affidavits, without consideration of demeanor of witnesses, is contrary to fundamental principles of our legal practice." Conforti v. Guliadis, 245 N.J. Super. 561, 565, 586 A.2d 318 (App.Div. 1991).
Defendant has suggested that plaintiff need not receive additional distribution, since she has been amply provided for out of other distributable assets. The defendant husband in Gibbons v. Gibbons, 174 N.J. Super. 107, 415 A.2d 1174 (App.Div. 1980), rev'd on other grounds, 86 N.J. 515, 432 A.2d 80 (1981), a divorce case involving the great wealth of both parties raised similar arguments to those of Mr. Berrie. Judge Pressler, writing for the court, stated:
The position taken by the husband is that under the circumstances here equitable distribution should have been limited to, if anything at all, the joint assets. He argues that in view of the amounts of the wife's separate estate, there is no rational basis justifying her sharing in his separate and larger fortune. It is his contention that she does not need any part of it and did not contribute in any way to its acquisition. In our view these arguments are antithetical to the philosophy of equitable distribution as conceived of by the Legislature in its enactment of N.J.S.A. 2A:34-23 and as developed and articulated since that enactment by our Supreme Court.
Id. at 112, 415 A.2d 1174.
Both parties are entitled to have all issues fully explored. The trial court erred in not allowing discovery and if factual issues remained, a plenary hearing on the distribution of the corporate stock. The decision should not have been based solely upon conflicting factual information and upon the limited information presented to the court through briefs and appendices.
This matter is remanded to the Family Part for further proceedings not inconsistent with this opinion.
NOTES
[1] The second order appealed from, discussed in more detail later, carried out this first order and denied any alternative theories of recovery which would implicate these assets.
[2] Plaintiff contends that she guided defendant on how to operate in the Korean environment, including working with and obtaining protection from the Korean government. She states that she established liaisons with Korean suppliers and took advantage of her prominent family connections to develop Korean trade. She also travelled with defendant to trade shows seeking new suppliers and customers and participated in design discussions and other decision making within the company. Many extended corporate meetings were held at the parties' home.
[3] In opposition to plaintiff's pendente lite application defendant claimed that this value was as of February 1980 when he filed his complaint in his first divorce action. However, we note his sworn testimony on October 19, 1981 that the company was worth only $1,000,000, that its book value was approximately $2,000,000 and that its net annual profits averaged $350,845 between 1975 and 1980.
[4] The SEC filings noted that defendant could elect all of the directors, amend the certificate of incorporation and approve a merger and like corporate actions. Furthermore, defendant receives by far the highest salary in the corporation, comprised of a base salary plus a percentage of net income; he receives rental payments for real estate leased to the company by him personally or by other entities controlled by him and has obtained mortgage guarantees by the company on such leased facilities (three in California, one in Florida, one in Illinois and two in New Jersey); he has been the beneficiary of corporate loans to him and other entities owned by him in an amount in excess of $3,000,000, approximately $1,400,000 of which is interest free; and he controls the decisions on declarations of dividends.
[5] This sentence probably should have reversed the words "jointly and," since one party could not acquire the property "jointly."