275 N.J. Super. 452 (1994)
646 A.2d 504
ALLEN F. GOLDMAN, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
SHARON H. GOLDMAN, DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1994.
Decided August 8, 1994.
*454 Before SKILLMAN, KESTIN and WEFING, JJ.
*455 Joel D. Siegal argued the cause for appellant/cross-respondent (Hellring, Lindeman, Goldstein & Siegal, attorneys; Mr. Siegal, Stephen L. Dreyfuss and Sheryl E. Koomer, on the brief).
Barry I. Croland argued the cause for respondent/cross-appellant (Stern, Steiger, Croland, Tanenbaum & Schielke, attorneys; Mr. Croland, of counsel; Jay Rubenstein and Meridith J. Bronson, on the brief).
The opinion of the court was delivered by WEFING, J.S.C. (temporarily assigned)
The parties to this matter were married in September, 1966; they separated in January, 1987, and were granted a final judgment of divorce on December 17, 1991. Defendant has appealed, and plaintiff has cross-appealed, from certain orders entered by the trial judge during the divorce proceedings and certain provisions of the equitable distribution ordered in the final judgment of divorce.
Two children were born of the marriage, both of whom are now emancipated. When plaintiff filed his complaint for divorce in 1988, the older son was in college and the younger in prep school. The family lived in a large home in South Orange and, during the course of the marriage, plaintiff engaged in several business ventures, one of which was quite successful and the last of which was not. He owned an envelope manufacturing business which he sold in December of 1981. The net proceeds from this sale were slightly in excess of $2,000,000. He invested this sum and supported his family with the income and dividends for the next several years while he investigated other business opportunities.
Plaintiff eventually settled on a foreign automobile dealership, Coast Imported Car, in Toms River. The business was conducted through four separate corporations: Coast Imported Car Corp., Coast Realty Associates, Select Auto Leasing Corp. and Coast Auto Electronics Corp. (all hereinafter referred to as "Coast"). He and his original partner in the venture, Joseph Amore, obtained *456 franchises for the sale and lease of Audi, Volkswagen, Porsche and Mercedes Benz automobiles. At the outset of the venture, plaintiff contributed $200,000 to the enterprise, while the $3,000,000 balance was financed through The First National Bank of Toms River (hereinafter "Bank"). Plaintiff was required to personally guarantee Coast's debts to the Bank. Plaintiff held a two-third interest in Coast while Amore, who contributed no funds, owned the remainder. In January of 1988, when the divorce complaint was filed, the amount of debt guaranteed by plaintiff in connection with Coast, including the floor plan, was in excess of $10,000,000.
Plaintiff entered the automobile business in 1985 and in October of 1987, the stock market collapsed. With it, according to plaintiff, so did the market for high-end luxury imported cars. Plaintiff also contended that the business suffered due to the decline in the dollar, certain adverse publicity associated with Audis and a nationwide decline in the sale of Volkswagens.
In November of 1988, the trial court entered one of the orders at issue here which provided in part:
Both plaintiff and defendant are hereby restrained and enjoined from alienating or encumbering in any manner any of the assets of the parties or either of them, except that plaintiff shall not be restrained and enjoined hereunder from conducting his business known as Coast Imported Cars in the ordinary course and provided that the parties may alienate or encumber any assets upon their mutual agreement in writing or upon further order of this court[.]
After entry of that order, and despite its existence, plaintiff advanced, from marital funds, some $400,000 to Coast. Of that total, $350,000 was advanced in an effort to meet critical cash shortages, and $50,000 was used to pay plaintiff's counsel fees incurred in litigation between himself and Amore.[1] Plaintiff's efforts to keep the business going and ultimately to sell it were unsuccessful. In December of 1990, he transferred the business and the realty associated with it to the Bank in exchange for a *457 release of liability. Trial commenced in this matter in January of 1991. By that date, Coast, to which plaintiff had attributed a net value of $1,000,000 on a February 1987 financial statement, had no value.

I.
Defendant's two initial points on appeal revolve around the trial court's refusal, as part of the equitable distribution, to give her a credit of $200,000, or one-half of the marital funds used by plaintiff in the business of Coast, and the trial court's decision that, for purposes of equitable distribution, Coast should be valued as of the time of trial, rather than the date of the filing of the complaint. Both of the trial court's determinations on these issues are contained in Goldman v. Goldman, 248 N.J. Super. 10, 589 A.2d 1358 (Ch.Div. 1991).
We have concluded, upon a careful review of the record and consideration of all the arguments advanced, that the trial judge's reasoning in both regards was, in the particular situation presented here, ultimately correct. Our affirmance of those holdings should not be construed as permission for one spouse to use marital funds as venture capital with impunity. We think that the trial judge here correctly recognized that he was confronted with a unique situation and that application of a rigid categorical analysis would have only hindered him in fulfilling his ultimate obligation to effectuate a distribution of marital assets which, overall, was equitable to both parties. The consequence of value fluctuations for purposes of equitable distribution should not, for instance, turn wholly on whether an asset is properly classified as an active or passive asset. Scavone v. Scavone, 230 N.J. Super. 482, 553 A.2d 885 (Ch.Div. 1988), aff'd 243 N.J. Super. 134, 578 A.2d 1230 (App. Div. 1990).
Defendant contends that the result of an affirmance of the trial judge's action here will be to encourage spouses to pour marital assets into failing business enterprises. We disagree. We note, for instance, that defendant stipulated below that plaintiff did not *458 act with bad faith in making these transfers, and that defendant presented no proof during the course of the trial either that the transfers into Coast were unreasonable in terms of business judgment or that Coast failed due to plaintiff's poor business judgment or mismanagement.
Defendant argued below and repeats on appeal that after entry of the order of November 3, 1988, plaintiff not only used $400,000 of marital funds in connection with Coast, but he also used marital funds to meet his pendente lite support obligations. To the extent that plaintiff did so, defendant was entitled to a credit under Weiss v. Weiss, 226 N.J. Super. 281, 543 A.2d 1062 (App.Div.), certif. denied, 114 N.J. 287, 554 A.2d 844 (1988). The trial judge here gave the defendant the full credit to which she was entitled. We do not believe that the fact that plaintiff may have used marital assets improperly in one respect must lead, inexorably, to a conclusion that all of the plaintiff's actions were improper.
Defendant also argued below, and repeats on appeal, that plaintiff acted in violation of a court order when he made these transfers and that sanctions should be imposed. The order at issue barred both parties from "alienating or encumbering in any manner any of the assets...." To alienate is to convey or transfer title to an asset. Black's Law Dictionary 96 (4th ed. 1968). Transferring these funds into Coast could not be considered a violation of that portion of the order. To encumber an asset is to make it subject to a charge or liability. Id. at 908. While these transfers could arguably be viewed as an encumbrance, we agree with the trial judge that, in reality, what occurred was a transfer from one marital asset to another. Goldman v. Goldman, supra, 248 N.J. Super. at 18, 589 A.2d 1358.
We are confident that if this experienced trial judge, who was fully familiar with this matter, had a perception that plaintiff's actions were a contemptuous flouting of the court's authority, he would not have hesitated to impose significant penalties on the plaintiff. We will not second guess him now.

*459 II.
Defendant's next argument revolves around certain transactions between plaintiff and his brother Budd. Budd Goldman established a business, Banning Enterprises Ltd, to import and sell giftware. On February 27, 1985, plaintiff lent $200,000 to his brother in connection with that business. The terms of the loan were reflected in a letter from Budd Goldman to his brother dated February 27, 1985, which called for an interest rate of 12%, with the principal due in five years. The loan was to be secured by an unrecorded mortgage on property located at 1921 Bellmore Avenue, Bellmore, New York. The record does not indicate that a separate mortgage document was ever executed.
Budd Goldman made regular interest payments to his brother, receipt of which was reflected in the joint income tax returns filed by these parties. In August of 1986, plaintiff and his brother Budd agreed, again by letter, to reduce the interest rate from 12% to 10%; regular interest payments continued, however. In January of 1987, the month in which plaintiff and defendant separated, plaintiff advanced an additional $50,000 to his brother. This loan was at 8% and was again to be secured by the same unrecorded mortgage. In November of 1987, after the parties to this action had been separated for almost a year, and just prior to plaintiff filing his complaint for divorce, plaintiff and his brother negotiated a revision to their loan agreement. Under the revised terms, interest payments were deferred until maturity, which was extended until December 31, 1991, and the previously secured loan was converted to an unsecured one. This agreement was reflected in another letter between the brothers, dated November 5, 1987.
Converting the loan into one which was unsecured permitted Budd Goldman to sell the property at Bellmore Avenue; he realized over $200,000 from the sale of that real estate. Plaintiff made no effort to collect on the outstanding loan at that time. The proceeds of the sale of the real estate were evidently used by Budd Goldman in the Banning business. Plaintiff at a later point advanced an additional $50,000 to his brother Budd. Banning *460 encountered subsequent financial reversals and the business ultimately had to be sold to avert bankruptcy. Budd Goldman has not yet repaid any part of the loans made to him by his brother and his financial status makes their collectibility doubtful.
As part of the equitable distribution which was ordered in this matter, defendant received a credit of $25,000, one-half of the plaintiff's final loan to Budd Goldman. The trial judge also directed that plaintiff execute whatever documents would be necessary to permit defendant to attempt to recover directly from Budd Goldman her one-half share of the remaining loan balance.
On appeal, defendant urges that all of these loans were a pre-complaint dissolution of marital assets under Kothari v. Kothari, 255 N.J. Super. 500, 605 A.2d 750 (App.Div. 1992), and that she should have received an additional credit of $125,000, or one-half the total of the pre-complaint loans. The trial judge denied her request within his letter opinion of June 24, 1991, in which he found that defendant knew of the loans prior to the couple's separation and had acquiesced in them. Despite defendant's protestations to the contrary, that is a factual finding by the trial judge which is supported by the record and we will not overturn it. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
The trial judge did not, however, distinguish between the decision to advance the funds, of which defendant was aware, and plaintiff's agreement to convert the loan into one which was unsecured in apparent anticipation of his brother's sale of this property. Nor does the record indicate that the trial judge considered the effect of plaintiff's concurrent agreement to forego collection at that time. The record contains no evidence that defendant was aware of and acquiesced in those decisions.
In light of that, we have reached the conclusion that this matter must be remanded to the trial judge. We note that if *461 there was a valid mortgage between these two brothers,[2] only Budd Goldman's own honesty would have prevented him from selling this property at any time to an unsuspecting purchaser, since the mortgage was not recorded. It may be necessary to consider whether plaintiff's conversion of the loan into one which was unsecured in fact, and his agreement to extend the loan, worked a quantifiable impairment of defendant's security. To the extent the conversion of the loan from secured to unsecured and the forbearance in collecting the loan did impair defendant's security, she would be entitled to a credit from the plaintiff.

III.
Among the assets owned by plaintiff and subject to equitable distribution was his twenty-five percent interest in an investment known as Dunnell Associates ("Dunnell") which purchased property at 115 Dunnell Road, Maplewood, constructed a building on the property and thereafter leased and managed it. The judge fixed the pre-tax value of plaintiff's interest in Dunnell at $110,036. In his letter opinion of June 24, 1991, the trial judge held that plaintiff's interest in Dunnell would be divided, as were all other marital assets, on a fifty-fifty basis. He concluded that under Orgler v. Orgler, 237 N.J. Super. 342, 568 A.2d 67 (App.Div. 1989), he could not consider hypothetical taxes to the plaintiff in valuing plaintiff's percentage share of this asset.
In October of 1991, prior to the entry of the final judgment of divorce, the trial judge indicated to the parties that he was considering revising that determination. Both parties submitted supplemental briefs on the issue and the final judgment which was entered in December awarded to defendant forty percent of the plaintiff's interest in Dunnell. That determination is reflected in a subsequent letter of the trial judge, dated June 24, 1993.
*462 Plaintiff argues that this final adjustment by the trial court for the tax consequences involved in a sale of plaintiff's interest in Dunnell is contrary to the holding of this court in Orgler v. Orgler, supra. We do not agree. In Orgler, we stated: "We adopt as sound ... that hypothetical tax consequences upon the future sale or transfer of marital assets should not be deducted from present value for equitable distribution purposes. The hypothetical tax is simply too speculative to permit a reduction in value." 237 N.J. Super. at 355, 568 A.2d 67. We continued, however, in the following manner:
Although hypothetical tax consequences should not reduce the present value of marital assets, such a consideration ... has an important place in the equitable distribution process.... Thus, the hypothetical tax consequence, presumably fixed by competent expert testimony, is a factor to be considered with all other factors, such as the respective earning capacity of the parties, their health, education and contribution to the marriage, in determining the distributive share of each party.
[Id. at 356, 568 A.2d 67.]
Here, the trial judge did not reduce the present value of plaintiff's interest in Dunnell Associates to compensate for the tax consequences he would experience. He did, in this one instance, adjust the percentage of distribution, in recognition of potential tax consequences, to achieve a distribution which he considered equitable. We consider the trial judge's actions in this regard as fully consonant with the principles we enunciated in Orgler.

IV.
As noted earlier in this opinion, plaintiff was, just prior to the commencement of the trial of this matter, able to negotiate an agreement with the Bank under which the assets of Coast were transferred to the Bank in lieu of foreclosure. That transfer, involving as it did a certain forgiveness of debt, carried with it certain tax consequences.
Early on in this litigation, the trial judge, in recognition of the contentious nature of this divorce and the size and nature of the assets, appointed an independent accounting expert, Seymour Rubin. Among the tasks performed by Mr. Rubin was the *463 calculation of the aforementioned tax consequences. Mr. Rubin reported to the judge and the parties that the December 1990 transfer to the Bank created a tax liability of $199,800. Within paragraph fifteen of the judgment of divorce, the trial judge directed that each party would share this obligation equally. Defendant now contends that the trial judge erred in doing so.
Again, we do not agree. If the marital assets in this matter were to be distributed on a fifty-fifty basis, as was recognized by the parties and the trial judge from the outset, we can perceive no reason in logic or fairness which would justify a departure from that percentage when distributing liabilities in this matter.
The tax consequences here arose as a result of the Bank's agreement not to seek to collect upon Goldman's personal guarantees. If the Bank had, indeed, attempted to collect upon those guarantees, there could have been a significant effect upon what defendant would have received by way of equitable distribution. We do not perceive that the trial judge in any way abused his discretion by assessing the tax consequences equally between the parties.

V.
Defendant's final point on appeal relates to the allocation of fees for Mr. Rubin, the court-appointed expert. Within his letter opinion of June 24, 1991, the court concluded that sixty-five percent of Mr. Rubin's fee would be assessed against the plaintiff because a "disproportionate amount" of the expert's time was the result of plaintiff's use of marital funds after the entry of the restraining order of November 3, 1988. Within the judgment of divorce, however, the court included dollar figures which had the result of allocating to the plaintiff fifty-seven percent of Rubin's fees and to the defendant forty-three, rather than thirty-five, percent. Defendant contends that the trial court did this without any further findings on the issue and seeks entry of a modified judgment in accordance with the percentages originally indicated by the trial judge.
*464 Once again, we do not agree. Defendant has included within her appendix a copy of a letter from plaintiff's counsel dated October 10, 1991, which forwarded to the trial judge a proposed form of final judgment of divorce. Within that letter, plaintiff's counsel set forth his position that Mr. Goldman should not be responsible for sixty-five percent of Mr. Rubin's total fee, but rather sixty-five percent of the time spent by Mr. Rubin in analyzing the Goldman accounts, for it was that time which was necessitated by Mr. Goldman's use of marital funds. Further, within that letter, plaintiff's counsel noted that by applying that analysis, plaintiff would be responsible for a payment of $47,386.25 to Mr. Rubin and defendant, a payment of $36,113.75. The trial judge employed those figures in the final judgment which was entered. We consider it clear that in doing so, he was persuaded by the arguments set forth in the letter of October 10, 1991. In our view, he had full discretion to do so and we perceive no abuse.

VI.
Plaintiff raises two issues on his cross-appeal. He contends first that the trial judge erred in not directing that any capital gains tax payable by the plaintiff as a result of the sale of the marital home be deducted from the gross proceeds. Plaintiff argued below, and repeats on appeal, that the trial court's approach is unfair to him since he must pay, immediately, capital gains tax on his share of the sale of the marital home, while the defendant will be able to use her proceeds to purchase a new residence and thus defer her tax consequences. 26 U.S.C. § 1034 (1988). Plaintiff, having purchased a condominium residence following the parties' separation, cannot utilize that deferral technique. However, as the trial judge noted, defendant is not escaping taxes and she will, in the trial judge's words, eventually have to make peace with the IRS. We decline to reverse his determination in this regard.
Plaintiff's final argument was an alternative one, premised upon the possibility that this court would reverse the trial judge's *465 determination on the proper valuation date for Coast or grant defendant credits for the $400,000 post-complaint transfers to Coast. Since we have, however, affirmed the trial judge's determinations in both regards, the point is moot.
The matter is remanded to the trial court for further proceedings in accordance with point II of this opinion. In all other respects, the matter is affirmed.
NOTES
[1] That litigation was eventually settled. By the terms of the settlement, plaintiff became the sole owner of Coast.
[2] That is an issue which we do not determine for it has not been argued before us and may involve principles of New York law. Neither do we address or consider whether defendant would have been entitled to enforce any rights as a mortgagee under those letters.