OPINION OF THE COURT
Nicholas Colabella, J.
In a matrimonial action, the parties seek a divorce and ancillary relief. Plaintiff is awarded a judgment of divorce based upon cruel and inhuman treatment of her by defendant as testified to by plaintiff at trial. Custody and visitation shall be according to the parties’ stipulation in court on January 5, 1993. Remaining for determination are equitable distribution, maintenance, child support, support arrears and counsel fees.[1]
BACKGROUND
The parties were married on February 14, 1976. The action for divorce was commenced approximately 12 years later on or about February 11, 1988. At that time, plaintiff was 41; defendant was 46. At present, plaintiff is 48, defendant is 52. Both parties are in good health. They have one child — Kathleen, born May 31, 1978, currently age 16.
Plaintiff holds an Associates degree in interior design from *81 Endicott Junior College, but has never been substantially employed in that capacity. Prior to the marriage, she worked as a customer service representative with Allstate Insurance Company and as a bookkeeper and assistant in her father’s business, the Kalaine Upholstery Company. She continued the latter, earning approximately $18,000, plus benefits, through the early part of the marriage until the birth of the parties’ child when plaintiff became a full-time mother and homemaker.
Defendant graduated from Manhattan College in 1965 with a Bachelor of Science degree, graduated from the University of Bologna Medical School in 1971 with a medical degree, completed an internship with New York Medical College in June 1973 and immediately thereafter began a four-year surgical residency at Flower Fifth Avenue Hospital. He received his medical license in 1975.
By the time the parties married, defendant had completed 31 months of his surgical residency. Defendant completed the remaining 17 months of the residency program in June 1977, began practicing medicine in July 1977, became a provisional member of the Lawrence Hospital staff in November 1977, began a full-time medical practice in 1977 and formed a professional corporation for his practice in 1980. Defendant earned a substantial income as a surgeon prior to the commencement of the action which enabled the parties to maintain an upper middle class lifestyle.
MARITAL PROPERTY
The following is marital property as defined in Domestic Relations Law § 236 (B) (1) (c):[2] Medical practice. The court credits the valuation of the practice by defendant’s expert Joel Rackower as of the commencement of the action at $133,000.[3]
In addition, plaintiff argues that defendant’s earning capacity was enhanced by his completion of the general surgical residency during the marriage and therefore that enhanced earning capacity should be considered as marital property. Defendant argues that the completion of the residency merely made him eligible to take the test for board certification and *82 that "eligibility” is valueless since he is able to work as a general surgeon without the certification.
Defendant’s argument fails because certification is not in issue. Regardless of certification, the completion of the surgical residency enhanced defendant’s earning capacity by enabling him to secure operating privileges at a hospital and to start his practice as a general surgeon. The ability to pursue a career as a general surgeon is as much a "thing of value” as the license in O’Brien v O’Brien (66 NY2d 576) and the degree in McGowan v McGowan (142 AD2d 355; see, Madori v Madori, 151 Misc 2d 737, affd 201 AD2d 859; cf., Shoenfeld v Shoenfeld, 168 AD2d 674, 675). Without the completion of the surgical residency, defendant would have been only a general practitioner.
Defendant argues in the alternative that, even if the enhanced earning capacity from the surgical residency was marital property, it merged in his practice and plaintiff is limited to the value of the practice as of the commencement of the action. Plaintiff concedes merger through the date of the commencement of the action and makes no claim to enhanced earnings in that time period, but maintains she is nonetheless entitled to an award of defendant’s future earnings to the extent they can be attributed to the surgical residency.
The doctrine of merger was first recognized on an appellate level in Marcus v Marcus (137 AD2d 131) in which the nonlicensed spouse sought separate awards for a medical license and a 30-year-old practice. Distinguishing O’Brien (supra) the Court reasoned that "in this situation * * * the medical license should be deemed to have merged with and been subsumed by the practice itself. Thus, if the plaintiff were to receive separate awards representing her share in the value of the defendant’s license and medical practice, a double recovery might well result” (supra, at 139). Marcus directed the lower court to determine the plaintiff’s appropriate share in the value of the license and practice by valuing the practice as a single asset (supra, at 140). The premise for merger appears to have been the view in O’Brien that "[a]n established practice merely represents the exercise of the privileges conferred upon the professional spouse by the license and the income flowing from that practice represents the receipt of the enhanced earning capacity that licensure allows.” (66 NY2d, supra, at 586.)
Marcus (supra) noted two other scenarios in which a separate award for a license could be made despite the establish *83 ment of a practice: (1) where a practice is newly established and has not yet developed to its full potential; (2) where a spouse has sold a successful practice and at the time of the divorce action either intends to open or has recently opened a new practice. In the latter example, "unlike instances in which the licensed spouse has completely retired, the license has reemerged as a significant and valuable asset similar to the factual situation in O’Brien v O’Brien * * * and thus the other spouse should be entitled to share in the value of the license.” (137 AD2d, supra, at 140.) Marcus did not address the issue raised here as to the effect on valuation of enhanced earning capacity when merger occurs.
In Finocchio v Finocchio (162 AD2d 1044), the Fourth Department clarified Marcus’ application of merger of a license and practice. The Court stated "[i]t was not the intention in Marcus (supra), nor could it have been, to apply merger in a way which would deprive the nonlicensee spouse of an award of any interest of the marital asset beyond commencement of the matrimonial action.” (Supra, at 1045.) To do so would "conflict with the requirement that the marital asset be valued in accordance with 'the enhanced earning capacity it affords the holder’ ” (supra). Finocchio held that where the value of a license merges in an established practice, the nonlicensed spouse remains entitled to an award of future enhanced earnings, but the valuation of the marital asset must be based on the actual earnings produced by the practice. The Court instructed the lower court on remittal to determine the "plaintiff’s equitable share of [the] practice in accordance with that method.” (Supra, at 1046.) For purposes of valuation and distribution, the license, the "thing of value” in Finocchio before merger became the practice after merger.
Finocchio cited the Second Department case of McGowan v McGowan (142 AD2d 355, supra), as in accord with its interpretation of Marcus (supra) based on the following language: " '[W]here, as in O’Brien, the husband’s highest educational attainment before marriage was a college degree and he acquired a medical license during the marriage and shortly before the divorce, the value of the license as an asset is measured by, (1) calculating the difference between the average total lifetime income that * * * a physician could expect, and (2) reducing the amount to a present value * * * It should be noted that once the "student-spouse” embarks on his career and develops a history of actual earnings, the methodol *84 ogy outlined above should be discarded and the projections of future earnings should be based on actual past earnings produced by actual practice. In other words, the value of the degree or license merges into the value of the subject’s professional or business practice’ ” (emphasis added). (Finocchio v Finocchio, supra, at 1045-1046, quoting McGowan v McGowan, supra, at 359, n.)
The interpretation of "merger” in Finocchio (supra) is consistent with the rationale of O’Brien (supra). If the licensed spouse continues to benefit from an enhanced earning capacity over the course of his or her work life, the nonlicensed spouse should retain the right under O’Brien to the future earnings of the licensed spouse regardless of merger of the license with a practice.[4] 5By contrast, the application of merger to extinguish the right to future enhanced earnings is patently arbitrary. Under this approach, the nonlicensed spouse in a divorce action commenced before a practice is established may receive an award of future earnings of the licensed spouse, but a nonlicensed spouse in an action commenced after the practice has matured is divested of any share in future earnings.[5]
Freed, Brandes and Weidman observe in their treatise Law and the Family New York that "the Second Department’s adoption of the word 'merger’ clouds rather than clarifies the murky waters of license valuation. 'Merger’ as used in Finocchio, refers simply to that point in time when the student-spouse/working-spouse pursues his/her career and develops a history of actual earnings. What surely must have been intended was an alternate valuation method, perhaps more meaningful, since it considers actual earnings rather than hopeful projections. At some point in time the valuation *85 methodology should be based on actual earnings, and the value of the license should be one comparable to the value of the professional practice.” (3B Foster, Freed and Brandes, Law and the Family New York § 16:11, at 81-82.)
Defendant argues that the Second Department has rejected Finocchio (supra) in more recent precedent in Kalisch v Kalisch (184 AD2d 751) and Maher v Maher (196 AD2d 530) in which the Court refused to make a separate award for a license after merger, limiting the award to the practice. Like Marcus (supra), however, neither Kalisch nor Maher specifically address the issue in Finocchio of whether to value the future enhanced earning capacity from a license after merger. Finocchio is nonetheless consistent with the narrow holdings in Marcus, Kalisch and Maher in only awarding an equitable share of the practice, not the license, based on the earnings from the practice. Defendant’s argument also ignores the similar analysis by the Second Department in McGowan (supra), quoted above in Finocchio, where the Second Department did address the effect of merger in valuing future enhanced earnings.
Defendant’s argument, that the Finocchio approach provides for a double recovery since some future earnings are already included in a traditional practice valuation, is without merit. While the traditional methods of determining the present market value of a practice do consider future earnings,[6] the extent to which future earnings from a practice are considered is markedly different than when used in valuing enhanced future earnings. In determining the value of the practice at the time the action was commenced, for example, Randisi multiplied the weighted average of the net income to the practice in a year by a capitalization rate of 1 Vi to 2 to arrive at the value of the practice’s intangible assets as between $74,565 to $99,420. Under an alternative "market” approach, using goodwill as a measurement, the earning stream was carried forward only one year to arrive at a value of $92,000. By contrast, Randisi valued defendant’s enhanced future earning capacity by projecting his actual earnings of $216,000 over the course of his remaining work life, depending on the age of retirement, of 15 to 19 years. One reason for the lower value of a practice under the traditional methods is that much of a practice’s profitability depends on the reputation of its current owner. Consequently, a practice is generally worth less to a *86 purchaser than it is to the seller. Its primary value, apart from tangible assets, lies in its referral base. A general surgical practice in particular is worth less than a general practice since the former is less likely to have repeat patients. To avoid counting the same earnings twice in this case, Randisi deducted the income used in determining the present value of the practice from his calculation of defendant’s future enhanced earning capacity.[7]
The court credits the valuation of Randisi of defendant’s future enhanced earning capacity at $702,000 based on his working to age 64. The comparison of defendant’s actual earnings as a general surgeon and as a general practitioner from the commencement of the action until retirement comports with Finocchio (supra). Randisi, however, failed to apportion the enhanced earning potential according to the degree it is attributable to the marriage.[8] The enhancement attributable to the marriage only took place in the last 17 months of the residency (McAlpine v McAlpine, 176 AD2d 285; McGowan v McGowan, supra; Allocco v Allocco, 152 Misc 2d 529, 534-535). Pro-rating that valuation leaves 35% or $245,700 subject to equitable distribution.
Defendant’s contention, that the valuation is invalid because Randisi arbitrarily inflated the average salary for a general practitioner — $78,000—by 15% to reflect defendant’s years of experience and an additional 25% to reflect a premium for the location of the practice in the Scarsdale/Westchester area in arriving at the salary of $110,000, is specious. The inflation of the average salary inured to defendant’s benefit. Had no adjustment been made, the calculation of defendant’s enhanced earning capacity would have been substantially more. Defendant’s objection, thus, can only be understood as an objection that the 40% increase was not enough. Defendant, however, had an opportunity to present contrary expert evidence of a higher amount and chose not to do so. The court finds defendant thereby waived his right to object that the adjustment was too low and tacitly accepted that, at a minimum, 40% was appropriate.
Defendant is also incorrect that there was no objective test *87 of Randisi’s assumptions. On cross-examination, Randisi testified that there was approximately a 59% difference between the salaries of the average general practitioner and the average general surgeon. By contrast, there was only a 51% difference between the adjusted salary of a general practitioner and the actual earnings of defendant. This suggests that, if anything, the adjustment by Randisi may have been too high.
Defendant incorrectly argues that the valuation of enhanced earning capacity must be reduced by the total value of defendant’s pension plan. The pension plan was valued based on contributions up to the commencement of the action; the enhanced earning capacity was valued after the commencement of the action. Accordingly, there was no overlap in the valuations.
The court declines to grant plaintiff any share of the enhanced earning capacity, however, based on the parties’ respective contributions to its acquisition and the separate award of maintenance herein (see, Domestic Relations Law § 236 [B] [5] [d] [5], [6]). While the final 17 months of defendant’s surgical residency were important to defendant’s career in that it enabled him to secure operating privileges, they were merely the culmination of years of effort by defendant preceding the marriage. Defendant continued to support himself during this relatively short period of time as he had before the parties’ marriage without significant contributions or sacrifice by plaintiff towards defendant’s completion of the residency program (see, McAlpine v McAlpine, supra [no award where spouse made no sacrifice of career or educational goals and did not make substantial contribution to attainment of fellowship]; cf., Kutanovski v Kutanovski, 120 AD2d 571; Savasta v Savasta, 146 Misc 2d 101 [each awarding only 10% of the value of a medical license where the spouse failed to make a substantial contribution to the obtaining of the license]). In addition, plaintiff has been awarded maintenance from the commencement of the action in 1988 and she will continue to receive maintenance for a period of six more years. The total support awarded here (including defendant’s direct payment of various marital expenses) already represents a distribution of defendant’s future earnings and exceeds the value of the marital portion of defendant’s enhanced earning capacity from the surgical residency. A further distribution of defendant’s future earnings would be inequitable. An equitable distribution award of the enhanced earnings in *88 this case, plus maintenance, would also result in a double recovery from the same earnings stream since the maintenance award here is based on defendant’s total income (see, Semans v Semans, 199 AD2d 790, n).[9]
COUNSEL FEES
Plaintiffs request for an award of attorney’s fees is granted to the extent the court refers the issue for a hearing. Counsel shall appear at the courthouse, room 800, on June 20, 1994 at 9:30 a.m. for the scheduling of a hearing. Plaintiff shall file a copy of this order with the Clerk of the Trial Assignment Part forthwith.
Unless otherwise directed after the hearing on counsel fees, the judgment entered September 7, 1990 for attorney’s fees of $30,000 in favor of plaintiff’s former attorneys shall be satisfied by plaintiff at the closing on the marital residence from her share of the net proceeds.
The provision of a so-ordered stipulation dated November 21, 1989 between plaintiff and her prior attorney, that no judgment of divorce would be entered before satisfaction of the judgment for fees, is declared void on public policy grounds. It interferes with the court’s ability to administer its cases; it is inconsistent with the rule of the court providing that failure to submit a judgment when directed by the court will result in abandonment of the action (22 NYCRR 202.48) and it is contrary to the spirit and intent of recent rules governing the conduct of attorneys in matrimonial actions which provide that a charging lien only entitles the attorneys to payment for services out of the proceeds of the final order or judgment (22 NYCRR 1400.2). Entry of the judgment of divorce is also necessary to the implementation of this decision to sell the property from which the money judgment shall be paid.[10]
Settle findings of fact and conclusions of law and judgment of divorce in accordance with 22 NYCRR subtitle D, chapter III, subchapter B, and qualified domestic relations order on notice with a copy of this decision.

. Portions of this opinion dealing with equitable distribution, maintenance, child support and arrears have been deleted for purposes of publication.

. The court has limited its decision to those items addressed by the parties in their posttrial memoranda.

. The court rejects the valuation by plaintiffs expert Martin Randisi because he used data from after the commencement of the action and failed to deduct monies contributed to the pension plan.

. One commentator observes "[t]he Finocchio approach makes eminent sense where the licensee spouse has a worklife expectancy which extends past the valuation date employed for valuing the practice.” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C236B:6, 1994 Pocket Part, at 86.) In the case at bar, for example, defendant had a work life expectancy of between 14 to 19 years after the valuation date for the practice.

. If practices are valued as defendant suggests " 'while licenses are valued as in O’Brien and its progeny, the nonlicensed spouse whose doctor or lawyer husband or wife says goodbye the day he or she starts the first job after completing professional training may count herself or himself blessed by the Court of Appeals if not by heaven.’ ” (Parlow v Parlow, 145 Mise 2d 850, 857-858, quoting Jacobson, O’Brien: Picking Our Way Through The Bramble Bush of Valuation, 19 [No. 1] Fam L Rev 7, 10 [NY St B Assn, Mar. 1987].)

. See, IRS Rev Rul 59-60.

. Plaintiff argues in her supplemental posttrial memorandum that the court should ignore this deduction, but offers no analysis for her position. Plaintiff is bound by her expert in the absence of contrary expert opinion or an adequate basis in the record to contest the extent of Randisi’s deduction.

. Randisi was incorrectly told by plaintiff’s attorney to assume that defendant was married in his first year of his surgical residency.

. To avoid such so-called "double-dipping” would require deducting any award of defendant’s future enhanced earnings from the income available to defendant, in turn reducing the maintenance to be awarded.

. The provision has since been waived by plaintiffs former counsel.