OPINION OF THE COURT
Lewis R. Friedman, J.
This is the court’s decision, findings of fact and conclusions of law after the trial of this divorce action. On December 7, 1995, the Court of Appeals decided McSparron v McSparron (87 NY2d 275); this case was reopened for additional proof on the value of defendant’s (Husband’s) license to practice law. The parties each retained experts other than those who had testi *810 tied at the trial and testimony was taken on the McSparron issue.
The parties were married on December 26, 1971. At the time of the marriage both parties were 22 years old. There are two infant children of the marriage. This action was commenced on July 30, 1992.
At the time of the marriage Husband had completed nearly one and one-half years of his law school education. Husband has worked in a specialized field of law for many years. He is currently the managing partner of a small specialized law firm. Husband’s earnings rose steadily over the late 1980’s; his income from the practice of law has exceeded $1 million per year since 1988. Wife, who was formerly a schoolteacher, and has a master’s degree, has essentially not worked outside the home since 1976, although in 1994 she earned about $10,000 from part-time employment.
Husband’s Interest in His Law Firm
The greatest part of the trial was devoted to the valuation of Husband’s interest in his law firm and its out-of-town affiliate. The valuation question presents several difficult issues that are not fully discussed in the cases. The court must determine the valuation date as well as questions affecting the application of "excess earnings” methodology to the facts herein.
Valuation Date
Husband’s income in 1992 was $2 million, while in 1995 it was $1.2 million. Prior to the trial Husband had moved for partial summary judgment, seeking to have the court fix the valuation date for the law firm interest as the date of trial. Wife opposed, argued that the proper date was the commencement date for this "active” asset, and suggested that summary judgment was inappropriate given the facts alleged. The court in a decision dated March 24, 1995 denied partial summary judgment and held that the disputed issues of fact required a determination after the trial. The court noted that there was a "strong possibility [that] Husband will be able to demonstrate that changes in the valuation are due to forces beyond his control”. The court had concluded that while the cases had established commencement date rule for "active” assets and a trial date rule for "passive” assets, the cases did not support a strict interpretation of the rule and that the trial court has the obligation to review each case on its own facts (see, Wegman v Wegman, 123 AD2d 220). That analysis was reaffirmed by the *811 McSparron decision (supra) In McSparron the Court of Appeals held that the active/passive formulation "may prove too rigid to be useful” and the distinctions "should be regarded only as helpful guideposts and not as immutable rules of law” (McSparron v McSparron, supra, 87 NY2d, at 288). The court must therefore resolve the question based on the proof at trial.
Husband contends, in essence, that there are both structural changes in his legal specialty and changes in the practice itself that occurred after the 1992 commencement date so that the 1995 trial date should be used. Husband asserts that the changes were the result of "market conditions” that were beyond his control so that use of the 1992 figure would be unfair to him.
Husband’s claim of structural change in his subspecialty is based on major changes in Federal legislation that will, he claims, alter the need for clients to seek counsel in that field of specialization. It is alleged that the change will become significant over the next 5 to 10 years. Husband and his expert contend that it is difficult for a firm such as his to expand into other fields without infringing on the referral sources for the core business of the firm. There were a series of significant cases in the 1991-1992 years which made those years exceptionally profitable for all of the firms in the area. There is, according to Husband and his expert, little likelihood of a repetition of the influx of new highly profitable cases in the foreseeable future. Of course, the 1991-1992 influx itself was not foreseeable prior to its occurrence, which was also based on factors beyond anyone’s control.
Husband also contends that the demise of several major clients led to a substantial decline in the firm’s business. The income from those clients declined by approximately $2.4 million from 1992 to 1994. Husband testified to the efforts he and his partners have made to increase firm revenue and to hold the line on costs. There is no doubt that firm income is down about $1.7 million from 1992 to 1994, but that is not as drastic as the reduction in fees from the three clients. The 1995 income is roughly equivalent to the figures for 1993. Although no attorneys were laid off, they now bill 1,750 to 1,900 hours per year instead of the prior 2,200 to 2,500 hours. The firm needed larger quarters in 1991 and decided to move at the end of the year. Therefore, in 1992 the firm moved to larger, more expensive space. The new lease included 17 months’ free rent, a substantial renovation allowance and a lower loss factor than the former lease. Rent increased $140,000 to $160,000 per *812 year for roughly twice the space for the 10 partners and 16 associates.
Wife contends that, despite Husband’s gloomy outlook at trial, his firm is flourishing. Gross revenues are increasing. Firm billings in 1994 were nearly $13 million, actually in excess of the 1992 figure. One of the "defunct” clients, now out of receivership, has paid about $1 million in 1995. The firm has numerous pending cases, including many in active litigation. Wife contends that the essence of Husband’s argument is that the firm lost two clients during the period prior to trial. Wife notes that Husband determined when the action would be commenced. He moved out of the marital home in February 1991 but delayed advising wife of his decision to end the marriage until early 1992.
There is no doubt that the origin of the active/passive distinction was the effort by the courts to prevent the unjust enrichment of one spouse at the expense of the other in the case of increases in value: the nontitled spouse should not benefit in the case of an activity actively managed by the titled spouse (e.g., Greenwald v Greenwald, 164 AD2d 706), or the titled spouse, in the case of increases in value of passively held property (e.g., Zelnick v Zelnick, 169 AD2d 317). Husband relies on a line of cases that have permitted a trial date value where there have been "market forces” beyond the parties’ control which have influenced the valuation. A close look at the cases reveals that they are generally applied in instances where the business has declined in value to the point of disappearance. For example, in Goldman v Goldman (248 NJ Super 10, 589 A2d 1358, affd 275 NJ Super 452, 646 A2d 504), heavily relied on by Husband, the automobile dealership which was wholly owned and operated by the husband became totally worthless because of the market and because the bank was holding husband’s interest in the dealership. The court felt that in that circumstance it would be inequitable to distribute the asset using the commencement date value (see, Rivera v Rivera, 206 AD2d 970). As Justice Saxe of this court recently noted, the date of trial rule should be used where the asset "has simply evaporated prior to trial, like an uninsured house which has burned down”. (Raskopf v Raskopf, 167 Misc 2d 1017, 1020.) Husband also relies on Alan Scheinkman’s 1991 and 1992 Supplementary Practice Commentaries (McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C236B:26, at 90-91, 102-103) where the author concludes that "in most cases” the date of trial value should be used to produce an equitable result.
*813 This court believes that the cases support the general use of the commencement date absent some substantial reason for a different date. There is no doubt that if the law practice had increased in value Husband would be arguing that the "windfall” should not be given to wife, even if the increase in value were purely fortuitous based on a large, unexpected fee from a new client. The policy of the courts is that trials should be held as soon as possible after the commencement date. Thus, had the case been tried by the end of 1992, as anticipated by the current matrimonial rules (22 NYCRR 202.16 [f] [3]), the commencement date value would have been used, without any question. The issue is who should bear the risk of gain or loss during the delay in the litigation. The active/passive rule provides, as the Court of Appeals stated in McSparron (supra), a "helpful guidepost”. Thus, absent a factor that would deprive the asset of any substantial value, or some other extraordinary circumstance, the court should give the benefit of both increases and decreases in value to the spouse owning and operating a business. The facts here establish no more than that Husband’s firm has lost several clients. That is nowhere near the circumstances in Goldman (supra) or the other cases on which Husband relies. (In Raskopf v Raskopf [supra], the court refused to conclude that a partner’s interest in a law partnership that dissolved after commencement had no value.) The court does not believe that the structural changes in the specialty in which Husband practices require a later valuation date. The testimony did not quantify the differences in income that are attributable solely to the legislation and change in outlook. If there were proper expert opinion the court could, of course, deal with the issue of the outlook in the profession in determining a proper multiple for use when performing as "excess earnings” valuation.
The court concludes that the valuation date that is fair and reasonable and that does not do an unfair injustice to either of the parties is the commencement date, July 30, 1992.
The Issues Raised by McSparron v McSparron
In McSparron v McSparron (supra), the Court of Appeals rejected the line of cases which had held that a license to practice law "merges” into the resulting practice (e.g., Marcus v Marcus, 137 AD2d 131; Duffey v Duffey, 198 AD2d 581; Maher v Maher, 196 AD2d 530; cf., Finocchio v Finocchio, 162 AD2d 1044). The Court held that "[t]he merger doctrine should be discarded in favor of a commonsense approach that recog *814 nizes the ongoing independent vitality that a professional license may have and focuses solely on the problem of valuing that asset in a way that avoids duplicative awards” (McSparron v McSparron, supra, 87 NY2d, at 285). The Court emphasized that the determination in each case must be individualized to account for the "harvesting” of a portion of the award prior to commencement of the matrimonial case. The Court also noted that methods must be adopted to insure that there is no duplication between the award for the value of the license and other distributive and maintenance awards in the same case.
The court notes that McSparron (supra) several times reminds trial courts that valuation is to be done in an individualized fashion so as to conform to the facts in each case. The court decides this case based on the proof submitted and does not necessarily imply that other valuation techniques would not be appropriate in other cases. Thus the conclusion in this case may not be the same as that reached by this court in a similar matter decided this date.
Since McSparron (supra) required that that case be retried on the issue of valuation, the court here reopened the trial to permit the parties such additional proof as they deemed appropriate. At the additional hearing wife relied on Joel Rakower, CPA, of Rakower Financial Appraisal Services, Ltd., while Husband relied on Dr. Joan Lipton, CPA, of Klein, Lipton. Those witnesses differed both with respect to their methodology and their analysis of the McSparron factors. They reached widely different conclusions. Wife’s expert concluded that the value of Husband’s license to practice law was worth $330,000, which had to be reduced for the period of education prior to the marriage to $165,000. He also opined that Husband had "enhanced earnings” which were worth either $1,728,000 or $2,118,000 as of August 1, 1992 depending on the court’s resolution of the differences between the parties’ experts on the value of Husband’s law practice. Thus wife’s expert found an additional $1.8 to $2.3 million for equitable distribution. Husband’s expert found the value of the license to practice law to be $469,000, assuming no duplication of the values used for the law firm valuation; she did not ascribe a separate value to the "enhanced earnings” because, she testified, that would be duplicative of the law firm value. In addition she opined that there should be no distribution of the value of the license because that would duplicate the award of maintenance.
"License” cases measure the difference in earning potential of the party holding the license over the earnings of a person *815 without the license (O’Brien v O’Brien, 66 NY2d 576). Traditionally licenses have been valued by one of two formulas. Where the license is relatively new the expert performs a statistical projection of the difference in earnings of a person with the license and the earnings of a person without it for the working life of the license holder and reduces the figure to present value, taking into account life expectancy (O’Brien v O’Brien, supra). In other instances the same computation is done using the actual earnings of the license holder rather than the statistical projection (see, Finocchio v Finocchio, supra). The Court of Appeals appears to have endorsed the use of actual earnings "where the licensee has already embarked on his or her career” (McSparron v McSparron, supra, 87 NY2d, at 286). The court should use "a more pragmatic and individualized analysis based on the particular licensee’s remaining professional earning potential” (supra).
The court is aware that literal application of McSparron’s language is extraordinarily difficult, without either running afoul of McSparron’s injunction against double counting of the license and the professional practice or creating another version of the now discredited merger doctrine. There is little doubt that a computation of the value of the license using the actual earnings of Husband as of the valuation date and the traditional methodology would result in a value which will nearly always be far greater than and duplicative of the practice value. That result is inherent in the traditional method of using the difference between actual earnings and a college graduate’s earnings and multiplying the result by the remaining work-life expectancy. A college graduate’s earnings are obviously going to be far less than the "reasonable compensation” figure for a comparable attorney used in an "excess earnings” formula, and the remaining work life is, except in cases of 62- to 65-year-old persons, far in excess of the one to three multiple used by experts in law practice valuations. In addition, since the same actual earnings are used in both computations the resulting value results in combining the values of the license and the practice, thereby effectively merging the practice value into the greater, more inclusive, license. Obviously that result was not intended by the Court of Appeals.
One of the reasons for the problems resulting from the use of actual earnings is that it measures a combination of several factors: the license, the use to which it is put, the individual characteristics of the holder and the practice in which it is *816 used. Patently, if the purpose of the exercise were solely to value the "license” itself, then the individual use to which it is put would be irrelevant. The result would be that all licenses issued at a particular date in a particular locality would have the same value. The cases which had adopted the merger doctrine were in part attempting to avoid this anomaly (see, Finocchio v Finocchio, supra; compare, Procario v Procario, 164 Misc 2d 79, 83-86). Wife’s expert attempted to deal with this question by ascribing a value to the "license” itself and a separate value to the "enhanced earnings” that result from it. Husband’s expert in one of her alternate scenarios also valued the license itself without regard to the enhanced earnings.
It is helpful for an analysis of the issues to review the testimony of the experts concerning their ipost-McSparron valuations of the Husband’s "license” to attempt to find a methodology that comports with common sense, McSparron (supra), and "economic reality”. The differing approaches used in this case are similar to the approaches taken by the single expert in Bergstein v Bergstein (Sup Ct, NY County, Aug. 8, 1996, Friedman, J., index No. 61940/92), decided this date.
The method that both experts used in one of their alternatives to determine the bare "license” value is similar to the statistical method that is traditionally used to value a freshly minted license such as that in O’Brien (supra). The difference in their results is that Husband used the 1995 Altman & Weil income of an attorney compared to that of a college graduate, while wife used the 1974 income figures, to compute the earning differential since that existed when Husband’s degree was issued. Both experts used similar mortality tables and both reduced the figures to present value using a 3% "true interest” rate that reflects the interest rate after inflation. Both experts accounted for the part of the earnings which had not yet been "harvested” by only including the years from the valuation date to age 65. The court is not convinced that either computation is completely accurate or appropriate. Wife’s analysis assumed that the earning differential would have remained constant from 1974 to 1992; there is no factual basis for that assumption. The result obtained by wife’s expert is far too low based on the small earning differential which seems to have been chosen to minimize the effect of coverture. Husband’s figures use 1995 as the only base; as noted above the court has concluded that the correct valuation date is 1992. In addition the national average earnings may not be correct for the earnings of an attorney or college graduate in the northeast. The *817 court concludes, based on the proof in this case, that the correct value for Husband’s license, using the statistical analysis method is in the neighborhood of $1,000,000. There is no doubt that a coverture fraction, representing the 50% of the legal training obtained after the marriage, must be used (see, Procario v Procario, supra; McAlpine v McAlpine, 176 AD2d 285). Therefore the value for equitable distribution of the "license” alone would be $500,000 under that formula.
Additional calculations have been submitted by the experts based on their attempts to understand the task set by Mc-Sparron (supra). Both experts seem to conclude it is possible to value the factors that are usually included in the valuation of a "matured” license. One of the ways is to value the portion of the "license plus enhanced earnings” that is not included in the practice value by performing the license value calculations using the "reasonable compensation” deducted in computing "excess earnings” since that amount is obviously not included in the practice. Wife’s expert uses the 1992 "reasonable compensation” of $320,848, subtracts the salary of an associate in a law firm who was admitted in 1974, $94,021, tax impacts the earnings differential, and then applies mortality and the 3% "true interest” to reduce the figures to a present value. He finds the license value is $1,728,000. Wife’s expert did not apply a coverture fraction to the result since he concluded that the value represented enhanced earnings of an attorney and that all of the enhancement occurred after the marriage. As noted above, the court finds that the correct reasonable compensation for 1992 was $294,860. Thus wife’s expert’s computation must be corrected to reflect the correct value. The court’s calculation gives an approximate value of $1,486,000.
On the other hand, Husband’s expert, Dr. Lipton, used a slightly different starting date, 1995, and the $450,000 "reasonable compensation” figure used in Fishman’s practice valuation, and subtracted the earnings of a college graduate, $51,061. Dr. Lipton then deviated from the traditional license computation formula by using a 20% discount rate instead of the usual 3%. She justified this substantial departure from the usual practice to reflect the risk inherent in a continuation until age 65 of the earnings stream at the present extremely high levels. While as noted below Dr. Lipton had a serious, well-founded concern as to the continued return on Husband’s practice, the concern cannot be said to apply to a computation based solely on "reasonable compensation” income. That is, the individual factors which the expert found relevant in setting a discount *818 rate for the determination of the license value based on total income do not apply if the only income is what other similarly situated attorneys are receiving. The total value Dr. Lipton found for the "license” under those circumstances was $910,000, which she then impacted for coverture. The court has recomputed the figures, using Dr. Lipton’s assumptions and a 3% factor, and found the total to be $2,321,000, which would have to be reduced for coverture. That value is not far different from wife’s expert’s value, given the different factors used to generate the earnings differential.
Dr. Lipton also performed a "license” valuation using the actual earnings of Husband as the Court of Appeals suggested in McSparron (supra). In that computation too she used a 20% factor to reduce the income to present value. The court believes that the use of a factor greater than 3% to reduce the income stream to present value is reasonable and appropriate under the circumstances. The 3% assumption is based on economic data that justifies a "flat” projection of income and reflects the presumed rate of return on safe investments to reach "economic reality.” Risk is not factored into the equation. If all that is valued is the projected return on the right to practice, it is not unreasonable to treat all persons admitted at the same year as having an equal opportunity to succeed. It is fair to assume that the license holder will work in a reasonable way, earning "reasonable compensation”, until the end of the work life. Yet, if the actual earnings stream earned by Husband is used to compute the value of his "license”, there is the substantial risk that the license holder will not continue to reap the same rewards for his entire remaining work life as at the present. This case typifies the situation. Husband is a very hard worker, putting in over 3,000 hours per year; he is the managing partner of a thriving law firm, who is very well compensated compared to his peer group. The court does not endorse the 20% figure used by Husband’s expert because she did not lay a proper foundation for her choice of that number. She did establish that the risk-free 3% discount is disproportionate to the realities of a highly paid practicing attorney and noted that the 33% generally used for practice valuation was probably too large. For all that the credible testimony revealed, the 20% number appears to be an arbitrary choice, not consistent with that used by the same expert in another situation, and was, perhaps, derived to meet the exigencies of this case. Husband’s expert concluded, as the court has (see, at 813-816, supra), that a valuation based on Husband’s full future income *819 necessarily "double counts” the good will aspect of the practice value. Accordingly the expert would simply add Husband’s share of the practice’s fixed assets to the "license” value, to produce a combined value for the "license” and practice.
The court is aware that in reliance on O’Brien (supra), the "enhanced earning potential” due to special training and education has been distributed as a marital asset (Elkus v Elkus, 169 AD2d 134; see, Golub v Golub, 139 Misc 2d 440). Although subject to intense analytic criticism, as is the result in O’Brien, that position is consistent with the Court of Appeals approach to the question of license valuations, since it applies the same principle to all forms of "enhanced earning potential”. In the case of the holder of a professional license, the professional upon graduating from school, and entering a profession, obtains two assets: the license and the "enhanced earnings potential” that entry to the profession provides. The logic of O’Brien and its progeny, which were definitively reaffirmed in McSparron (supra), compels this court to conclude that the value of the "license” referred to in the decisions is the combined value of the license and the enhanced earnings it may produce, so long as those values are not duplicative of the values of other assets or distributions in the case. Although the Court of Appeals instructed the trial courts to use individualized methods of valuation, the traditional methodologies, with the adjustments provided as indicated above, are the only ones based on the proof, which the court could reasonably apply.
Based on the proof it is self-evident that there is a coverture aspect to both elements of the "license” since the threshold for entry to the profession was Husband’s attendance at law school, part of which is a premarital, separate property asset. Under the circumstances here the court is willing to accept wife’s expert’s value of $330,239, rather than the more accurate value of $1,000,000 based on Husband’s expert’s testimony for the bare "license”, subject to a 50% reduction for coverture, and $1,486,000 for the "enhanced earnings potential” created by the license. It would appear reasonable to reduce that figure by 7%, or $104,030, to reflect the premarital, separate property component of that figure. Thus, the "license” referred to in McSparron (supra) available for distribution as a marital asset is $1,547,000. This court rejects the "entire earnings” methodology. That computation includes far too many variables and requires adjustment in the discount rate in ways that are not supported by the record and is incon *820 sistent with the established techniques used in the valuation field. Similarly the court rejects the original analysis of wife’s expert on the enhancement of the earnings since the court finds that there is a substantial reason for using a reduction to present value of 10% given that the earnings have some risk factor.
But that does not end the inquiry mandated by McSparron (supra). The Court of Appeals also made it clear that the trial court is to insure that there is no "double counting” of the "license” value and maintenance; "the courts also must be meticulous in guarding against duplication in the form of maintenance awards that are premised on earnings derived from professional licenses” (McSparron v McSparron, supra, 87 NY2d, at 286).* The court heard testimony on this question from both experts during the post-McSparron hearing.
Husband’s expert used a 6% figure to reduce to present value the maintenance and child support payments to wife, assuming that the figures are in the same range as the pendente lite award. Dr. Lipton asserted that the maintenance award would be duplicative of the distributive award to the extent of that amount. A similar approach has been taken by several other valuation experts who have lectured on the subject to lawyers and Judges throughout the State. Husband’s expert at the Mc-Sparron hearing concluded that there was an insubstantial duplication of value so that essentially the entire "license” value is available for distribution.
It would appear to this court that to the extent that wife will receive maintenance from Husband’s "license” and "enhanced earnings” potential and also receive maintenance paid from the same source there will be a duplication of values prohibited by McSparron (supra). As discussed below the court has determined that the proper maintenance in this case is *821 $180,000 per year until the house is sold and $102,000 per year thereafter. The award will be taxable to wife and deductible by Husband.
The court concludes that McSparron’s antiduplication rule requires that the value of the maintenance award be compared with the earning differential used in the license calculation. (See, Wadsworth v Wadsworth, 219 AD2d 410). Since wife is to receive 50% of the license value, an award to the extent of one half of the earnings differential would clearly be duplicative. The maintenance award here, including the reduced amount after the sale of the house, clearly exceeds that figure. Alternatively the court could reduce the maintenance award to present value, as wife’s expert suggests, and compare that figure to 50% of the "license” value. The numbers in the case still show that the maintenance award would exceed the distribution of the "license”.
It is this court’s observation that the effect of reducing "license” awards by the amount of maintenance will nearly always produce a net figure for the license that is very small. That is consistent with the suggestion in McSparron (supra) that the "license itself retains some residual economic value, although in particular cases it may be nominal”. (McSparron v McSparron, supra, 87 NY2d, at 285-286).

 The court rejects Husband’s expert’s implied analysis that this language in McSparron (supra) should also apply to child support. This court believes that the Court of Appeals was carefully using terms of art in its decision and the omission of reference to child support was intentional and not, as suggested, a mere oversight. The Child Support Standards Act (Domestic Relations Law § 240 [1-b]) clearly uses as its starting point the totality of the earnings of a spouse, subject to the $80,000 limitation in Domestic Relations Law § 240 (1-b) (e) (3), as interpreted in Matter of Cassano v Cassano (85 NY2d 649). There is no logical reason to presume that the Court soon after Cassano intended to preclude the use of certain sources of revenue as the basis for the computation of marital asset values and child support. The court also rejects the implied argument that duplication of maintenance and law practice "good will” is prohibited. If the Court of Appeals had meant to say so it easily could have.