*419 OPINION OF THE COURT
Judith J. Gische, J.
You can never step into the same river twice. (Native American Proverb.)
In the seminal cases of O’Brien v O’Brien (66 NY2d 576 [1985]) and McSparron v McSparron (87 NY2d 275 [1995]) the New York State Court of Appeals held that to the extent a professional license is acquired during marriage, it is an asset subject to equitable distribution.[1] The valuation of such asset involves converting projected earnings derived from that license into a present day dollar value. When the court awards spousal maintenance in a case involving a professional license, a concern arises whether the same projected earnings are paying for both equitable distribution and maintenance. In McSparron v McSparron (supra), therefore, the Court of Appeals cautioned the lower courts, in general terms, to be meticulous in guarding against duplication in the form of maintenance awards that are premised on earnings derived from professional licenses. In a greatly anticipated decision, the Court of Appeals more particularly addressed these issues of “double counting” the same streams of income. (Grunfeld v Grunfeld, 94 NY2d 696 [2000].) As more fully set forth below, the Court of Appeals decision remitted the case back to the trial court for clarification. This decision is the result of those further proceedings.
Pursuant to this court’s direction, the parties prepared a joint appendix of the relevant portions of the trial record. A testimonial trial, limited to expert analysis, was held on March 18, 2002.[2] Posttrial submissions were completed by July 3, 2002.
Defendant is an attorney and a partner in a law firm. The original trial was conducted before now deceased Justice Louis *420 Friedman. He found that the value of defendant’s law license was $1,547,000.[3] After considering all sources of defendant’s future income, which necessarily included income derived from defendant’s law license, the court awarded lifetime maintenance to plaintiff. The periodic maintenance payments were $15,000 per month until the sale of the marital residence,[4] after which time they were reduced to $8,500 per month, payable for the rest of plaintiffs life. Heeding the admonitions in the then recent McSparron decision (supra), the trial court undertook to avoid using the same income stream to pay both maintenance and any distributive award of the law license. Justice Friedman concluded that the value of the maintenance award exceeded 50% of the value of the law license and that, to avoid duplication, no part of defendant’s law license should be distributed to plaintiff. In effect Justice Friedman reduced the residual value of the law license to zero, because he concluded that all the earnings used to value the law license would perforce be used to pay out the maintenance award.
On appeal, the Appellate Division, First Department, held that one half the value of defendant’s professional license, i.e., $773,500, should have also been distributed to plaintiff[1] as part of her equitable distribution, notwithstanding the maintenance award.[5] The maintenance award was actually modified and increased by that Court.
The Court of Appeals modified the Appellate Division decision to the extent it awarded plaintiff the “full” half of the value of defendant’s professional license while also awarding maintenance. After so holding, however, the Court of Appeals specifically declined to simply reinstate the trial court’s decision regarding distribution of the law license and payment of maintenance. The Court stated as follows (at 706-707):
“On the other hand, Supreme Court’s decision does not expressly explain how the court took into ac *421 count defendant’s income from outside sources in determining the amount that the license distribution award should be reduced to avoid double counting. There is no double counting to the extent that maintenance is based upon spousal income which is not capitalized and then converted into and distributed as marital property. Thus, if Supreme Court fixed maintenance on the basis of defendant’s income from all sources (adjusting for any appropriate setoffs), the proportionate share of maintenance attributable to defendant’s unearned income should have been excluded from the court’s calculation reducing the license value by the value of maintenance. The record is not definitive as to whether Supreme Court made this adjustment in comparing maintenance to one half the earnings upon which the license value was derived. For that reason, we are unable to correct the Appellate Division’s duplicative use of the same income merely by reinstating Supreme Court’s order. Rather, we remit this aspect to Supreme Court to recalculate the required reduction in the license distributive award in accordance with McSparron and this opinion.”
The case, with the issues thus framed by the Court of Appeals remittal, was eventually assigned to this court for determination.
The total value of defendant’s law license, as determined by Justice Friedman, was $1,547,000. Defendant’s projected future earnings from all sources were expected to exceed $1 million yearly (Grunfeld v Grunfeld, supra, 255 AD2d at 21). To avoid double counting of income in the valuation of both defendant’s law practice and his law license, the trial court calculated the value of the law license only upon “reasonable attorney compensation.” Justice Friedman found that in this case “reasonable attorney compensation” was $294,860 annually. Compensation received by defendant in excess of that amount was attributed to the value of the law practice and equitably distributed between the parties as a separate asset. It is the law license, however, that is the focus of the parties’ present dispute. Plaintiffs largest potential equitable share of the law license is 50% of its value or $773,500.
In 1996 the present day value of the maintenance awarded by the trial court was $1,058,000. Value was calculated using an actuarial projection of plaintiffs life. It also reflected an adjustment for taxes.
*422 This court’s analysis is based upon the facts existing on August 8, 1996, the date of Justice Friedman’s trial decision. At that time, the trial court’s analysis was based upon a future projection of earnings. This decision will likewise make “future” projections as if it were still 1996. This court previously rejected plaintiffs contention that on remittal, plaintiffs financial information should be updated to account for actual events, rather than rely on projections (see Grunfeld v Grunfeld, NYLJ, May 26, 2001, at 21, col 4). The remittal was not an opportunity for the parties to develop new facts or retry issues previously decided.
The Assets Available
This court’s task is to (as best it can) draw the conclusions that Justice Friedman could have drawn about defendant’s projected unearned income stream and then determine how much of that income would be available for defendant to meet his future maintenance obligations. Both parties’ experts agree that there were only four additional assets owned by the parties in 1996. They disagree, however, about whether and to what extent these assets could have been expected to produce future streams of “unearned” income available to pay maintenance.[6] The four assets and their values, established at the original trial, are:
[[Image here]]
The total value of the parties’ collateral assets in 1996 was $2,330,000. Justice Friedman awarded half of those assets to plaintiff. Thus, the trial date value of defendant’s share of these passive assets was $1,165,000.[7]
The Expert Testimony
Plaintiffs expert contends that from the date of the trial decision (Aug. 8, 1996) through December 31, 2001, defendant’s holdings would have produced a return of $735,898 (approximately $138,000 per year). He further contends that from *423 January 1, 2002 forward, the assets could be expected to yield yearly income in the amount of $141,360. This later calculation is based upon a projected annual rate of return of 12.1339%.
The court rejects plaintiffs calculations. The projections are based upon market information as it developed in the five-year period after the 1996 trial decision. Certainly such information was not known in 1996 when the projection of unearned income should have been made. The court also believes that projected rates of return, of up to 12.1339% are far too high. It assumes too risky a use of money on which to reliably predict a future stream of income. Plaintiffs contention that the parties traditionally made risky investments does not command a different result. Indeed, the parties’ prior joint tax returns do not establish such high rates of return on their investments.
Defendant’s expert argues that he had no unearned income that exceeded what plaintiff could earn on her half of the parties’ passive assets. Thus, the argument continues, whatever income defendant earned on such assets would have also been earned by plaintiff, placing each party on an equal footing financially. Using a 6% rate of return, defendant’s expert opined that if defendant earned $69,900 per year on the assets, plaintiff, likewise, earned the same $69,900 for the same period of time. Defendant’s expert also argues that some of the assets were illiquid and, consequently, not capable of producing unearned income. The most obvious example being the marital residence since, for a little over five years after trial, it was an “asset in use” by plaintiff. Another example is the litigation proceeds because, at the time of the 1996 trial, they had not been distributed to defendant. It appears that the proceeds were expected shortly, although there was no actual date of distribution. Finally, defendant argues that because under the original trial decision he was directed to pay $576,000 of plaintiffs debt, he had less income producing assets available from which he could pay maintenance.
The court rejects defendant’s expert’s analysis. At the 2002 trial, defendant’s expert conceded that the 6% rate of return selected for her calculations was not predicated on any market conditions, let alone market conditions actually existing at the time of the 1996 trial. It was a rate chosen only to illustrate the point that the parties’ earnings from these passive assets would be equal regardless of the actual rate of return. Moreover, the Court of Appeals remand was not limited to consideration of only that portion of defendant’s unearned income which exceeded plaintiff’s unearned income. Whether plaintiff’s *424 projected passive income would have been equal to defendant’s passive income, is simply irrelevant to the issues before the court.
Finally, the court rejects defendant’s argument that the calculation of projected passive earnings over plaintiffs lifetime is significantly affected by plaintiffs initial use of the marital home and the requirement that defendant pay plaintiffs marital debt. These two issues are somewhat interrelated. Justice Friedman’s decision expressly provided that the marital home would be sold when the parties’ youngest child attended college. That event was to take place 62 months after the court’s decision. Upon sale, the marital residence ceased to be an “asset in use” and could be considered an asset capable of generating income. Justice Friedman directed that defendant pay $576,000, representing plaintiffs share of marital debt. The trial decision also provided that defendant would recoup the full $576,000 from plaintiffs share of the proceeds from the sale of the marital residence. Those recouped monies would then become an asset capable of producing future income. Thus, while in the first few years the value of the assets available to produce unearned income might be lower, in subsequent years the value of such assets would be significantly higher. The court’s analysis of projected unearned income can only be a reasonable prediction and not a precise mathematical calculation. Thus, the court predicates its determination of defendant’s projected unearned income on the conclusion that in 1996 and going forward he had passive assets worth approximately $1,165,000.
Calculation of Defendant’s Projected Unearned Income
Justice Friedman found that the “risk free” interest rate at the time of the original trial was 3%. In fact, this risk free interest rate was utilized by both parties’ experts in connection with the law license valuation calculation. The statutory interest rate on judgments in 1996 was 9%. (CPLR 5004.) Trial judges, in reported matrimonial cases during the relevant time period, used interest rates between 6% and 9% in making awards. (Lloyd v Lloyd, 226 AD2d 816 [3d Dept 1996] [trial court awarded 6% interest on installment payments of equitable distribution]; Garvey v Garvey, 223 AD2d 968 [3d Dept 1996] [trial court awarded 9% interest on installment payments of equitable distribution]; Jafri v Jafri, 176 Misc 2d 246 [Sup Ct, Rockland County 1997] [trial court found United States Treasury bond rate at that time was 7% and applied it as a discount rate to value wife’s medical license]; Hapeman v *425 Hapeman, 229 AD2d 807 [3d Dept 1996] [trial court held that prevailing interest rate for loans was 7.5%].) The court takes judicial notice that in June 1996, the Federal Reserve reported the prime interest loan rates at 8.25% and the interest payment on a six-month CD was 5.5%. (Federal Reserve Statistical Release, Selected Interest Rates [ < www.federalreserve.gov/ releases/hl5/19960617>] [release date June 17, 1996]; Binghamton Masonic Temple v City of Binghamton, 158 Misc 2d 916 [Sup Ct, Broome County 1993]; Matter of City of New York [Washington Hgts.-Highbridge Park Community Dev. Area], 82 Misc 2d 557 [Sup Ct, NY County 1975].)
Accordingly, this court concludes that in 1996 a reasonable projected rate of return on defendant’s passive assets was, at most, 9%. Defendant’s unearned income for purposes of this court’s analysis is, therefore, no more than $104,850 per year (9% of $1,165,000).
Calculation of Proportionate Share of Maintenance Attributable to Unearned Income
As more fully set forth below, because the proportional share of maintenance attributable to earned income is more than plaintiffs potential half interest in the law license, this court holds that the residual value of such law license is zero and that the trial decision of Justice Friedman should be reinstated. Put another way, because the difference between the total value of the maintenance and the proportional share of maintenance attributable to unearned income is more than one half of the value of the law license, there is no residual value in the law license.[8]
At the original trial, Justice Friedman, in addressing the issue of double dipping, expressly held that the value of the maintenance exceeded 50% of the value of the law license. Based upon this finding, Justice Friedman concluded that no part of the law license was left to distribute to the plaintiff. In so holding, Justice Friedman necessarily first applied all of the income derived from the law license to pay maintenance before using any of the unearned income to pay maintenance. This disproportionate application of monies was implicitly rejected by the Court of Appeals when they remanded the case back to the trial court with a direction that an appropriate adjustment *426 must be made for that portion of maintenance paid by unearned income.
Plaintiff now argues that all unearned income should first be used to pay maintenance before any of the income earned from the law license is used to pay maintenance. Clearly this method of calculation is more apt to produce a residual value in the law license. Indeed, plaintiff claims in this case that the entire maintenance award can be paid out of unearned income and, consequently, she is entitled to be paid a full half value of the law license as part of her equitable distribution.
The court rejects plaintiffs argument. It is contrary to the Court of Appeals decision directing this court to figure the “proportionate” share of maintenance attributable to defendant’s unearned income. Had the Court of Appeals intended to have this court first use all unearned income to pay maintenance before using any part of earned income, it would have so expressly stated.
A fairer approach, adopted by this court, is to consider that for every dollar of defendant’s earnings, a proportional share of unearned and earned income will be used to pay maintenance. Thus, for example, if defendant’s gross projected earnings are $100 and only $25 comes from unearned income, then for every dollar ordered paid in maintenance, 750 is attributable to earned income and 250 is attributable to unearned income.
The court must then compare that part of the total maintenance award that is attributable to earned income with the value of 50% of the professional license. If the maintenance attributable to earned income exceeds 50% of the value of the professional license, then there is no residual value left in the license for equitable distribution. If, however, the maintenance attributable to earned income is less than 50% of the value of the professional license, then the difference constitutes the residual value of the license, which should be distributed as part of equitable distribution to the nonlicensed spouse.
Applying these principals to the instant case, this court holds:
The projected yearly income from the law license was previously determined to be $294,860. Defendant’s projected annual unearned income over the life of the maintenance award is no more than $104,850. The anticipated total income available to *427 pay maintenance, therefore, is $399,710 annually, consisting of $294,860 earned income and $104,850 unearned income.[9]’[10]
Projected earned income is 74% of all income otherwise available to pay maintenance ($294,860 -r- $399,710 X 100%). Projected unearned income is 26% of all income otherwise available to pay maintenance ($104,850 -h $399,710 X 100%). Thus out of every dollar earned by defendant, 740 of earned income is being used to pay maintenance and 260 of unearned income is being used to pay maintenance.
The 1996 value of the maintenance award was $1,058,000. If 740 of every dollar paid for maintenance is from the law license, then, over time, 74% of $1,058,000 or $782,920 will be paid from earned income. Likewise 26% of $1,058,000 or $275,080 of the maintenance will be paid from unearned income.
Since the monies expected to be paid from the law license toward maintenance ($782,920) actually exceed half the value of the law license ($773,500), there is no residual value in that law license to be distributed as part of equitable distribution. Put another way, since the difference between the value of the maintenance award and the unearned income ($1,058,000 — $275,080 = $782,920) exceeds 50% of the value of the law license ($773,500), there is no residual value in the law license left to distribute.[11] Moreover, the values so very nearly approximate one another that no viable claim can be made that maintenance should be reduced because there is double dipping into the law license stream of income.
Conclusion
Accordingly, this court holds that Justice Friedman’s trial court decision is reinstated to the extent he made an award of lifetime maintenance to plaintiff and declined, as a result thereof, to award her any part of the law license as equitable distribution.

. In McSparron (supra), the Court of Appeals also held that a professional practice has value apart from any underlying professional license. At bar, plaintiff was awarded $1,290,880 representing her distributive share of 50% of the value of defendant’s law practice. (Grunfeld v Grunfeld, 255 AD2d 12, 17 [1st Dept 1999].) No issues regarding distribution of the law practice are before the court at this time.

. This decision is based upon the facts contained in the joint appendix, the March 18, 2002 trial record (including exhibits), factual findings contained in the prior court decisions and appropriate conclusions that can be made therefrom. (See Grunfeld v Grunfeld, 94 NY2d 696, modfg 255 AD2d 12 [1st Dept 1999], modfg Rochelle G. v Harold G., 170 Misc 2d 808 [Sup Ct, NY County, Friedman, J.]; see also Grunfeld v Grunfeld, NYLJ, Apr. 26, 2001, at 24, col 4.)

. The financial case was originally tried in two parts. After the first part was concluded and decision reserved by the trial court, the Court of Appeals rendered its decision in McSparron v McSparron (supra). The trial court recognized that the appellate court ruling greatly impacted resolution of the issues in this case. Accordingly the trial record was reopened and a “post-McSparron hearing” was held. The two trials constituted the basis for Justice Friedman’s August 8, 1996 decision (170 Misc 2d 808).

. The sale of the marital residence was to take place one year after the parties’ youngest child departed for college or 62 months after Justice Friedman’s August 8, 1996 trial decision.

. This award was in addition to the law practice and other of the parties’ hard assets which were part of equitable distribution between the parties.

. Neither party raises and, consequently, this court does not consider whether application of the coverture exclusion to valuation leaves additional income available for the payment of maintenance. Nor does the court consider whether baseline earnings (here those earnings of a college graduate) which are excluded from valuation are available to pay maintenance. (See Douglas v Douglas, 281 AD2d 709 [3d Dept 2001].)

. No claim is made that defendant had any separate assets at that time.

. This alternative statement of the court’s conclusion is included because the Court of Appeals remand speaks in terms of excluding that portion of maintenance attributable to unearned income before considering the issue of double dipping.

. Any income over and above these amounts is attributable to the law practice. Since the value of the practice was separately distributed to plaintiff as part of equitable distribution, it is not available to pay maintenance. (McSparron v McSparron, supra.)

. These projected earnings are not tax impacted. They are expected to support annual maintenance payments in the amount of $180,000 per year for the first five years and two months and thereafter support annual maintenance payments in the amount of $102,000.

. See n 8.