OPINION OF THE COURT
Howard Miller, J.
Plaintiff and defendant were married in India on May 23, 1980. There are two children of the marriage, Tanveer (date of birth Mar. 1, 1981), and Yaver (date of birth May 5, 1982). This action commenced June 11, 1991. Defendant is seeking, *247 inter alia, equitable distribution of plaintiffs medical license and psychiatric certification.
Prior to the marriage, plaintiff was working as a licensed physician in India, earning approximately $150 per month, and receiving a house, jeep and driver, and a servant. After the parties were married in India, plaintiff came to the United States, where she studied and passed the tests necessary to become licensed to practice medicine in the United States. Plaintiff was board certified in psychiatry in 1988 or 1989, and board certified in child psychiatry in 1992. In 1991, when the action commenced, plaintiff was earning $82,000 per annum working for a hospital and doing additional part-time consulting work. At the time of trial, plaintiff was earning $84,000 per annum from her private practice.
At the time of the marriage, defendant was earning $1,500 per month plus commissions as an insurance agent, and approximately $200 per month for part-time work at a hotel. In 1991, defendant was earning approximately $11,888 per annum. At the time of trial defendant was receiving Social Security disability benefits due to his physical condition.
The first appraisal of plaintiffs medical license presented to the court by the court-appointed appraiser, Goodman, Kahn, Hoffman, Nonenmacher & Hochman, valued plaintiffs enhanced earnings due to her medical license and psychiatric certification at $903,090, which, after applying a 25% coverture factor, resulted in a $359,009 marital share as of January 1, 1997. There being no extraordinary events which would prompt the use of that date for valuation, plaintiffs license, as an “active asset”, should be valued nearest the date of commencement of this action, i.e., June 11, 1991 (see, e.g., McSparron v McSparron, 87 NY2d 275). The court therefore directed a further appraisal to determine the value of the license on June 11, 1991. The second appraisal also provides calculations based on a range of discount rates.
The second appraisal (the Goodman appraisal) evaluates plaintiffs United States medical license and certification as of June 30, 1991 in a range of values, from a high of $1,183,131 to a low of $541,356, depending on the present value rate.
Testifying on behalf of plaintiff was Richard J. Stone of J. H. Cohn, L. L. P. (the Cohn appraisal), who valued plaintiffs license and certification as of June 11, 1991 at $366,053. That appraisal also provides a range of values, from a high of $534,076 to a low of $213,596, depending on the projected age of retirement and the present value rate.
*248 The difference in the values of plaintiff’s license and certification results primarily from three factors: (1) comparable occupational earnings; (2) plaintiff’s projected retirement age; and (3) application of a discount rate ranging from 3% to 12%.
The Goodman appraisal compared the earnings of a recent college graduate (statistical) with a psychiatrist, resulting in an earnings differential of $67,101.* The Cohn appraisal compared the earnings of a college graduate, aged 35-44, and some work experience with those of a psychiatrist (statistical), resulting in an earnings differential of $41,369. When plaintiff obtained her license to practice in the United States, she was 32 years of age, had already obtained her medical license in India, and had worked at that profession in India for at least two years. Mr. Stone testified that he utilized the 35-44-year-old college graduate’s earnings to reflect a college graduate with life/work experience. Given plaintiff’s extensive premarital educational and employment accomplishments, which substantially exceed those of a recent college graduate, the comparable earnings factor in this case corresponds with the Cohn appraisal’s use of a college graduate with work/life experience. The court therefore finds that the appropriate comparable earnings factor is $41,369, and the earnings differential calculation is $45,162.
The Cohn appraisal utilized a retirement age of 60, based upon two factors: (1) tables which calculate premature withdrawals from the work force; and (2) life expectancy of people born in India. On cross-examination, Mr. Stone testified that he believed that the life expectancy information for people born in India related to persons born and living in India. Ms. Enid Hoffman testified that the Goodman appraisal utilized a retirement age of 65 because “age 65 is what we use and the Court of Appeals tells us to use and is related to social security.” Although plaintiff testified she plans to retire in her “late 50’s”, given the nature of plaintiff’s employment, it can reasonably be anticipated that she will work until age 65, and the court finds that to be the appropriate projected retirement age.
Mr. Stone testified that.the discount rate is the most subjective factor in evaluating a license, and must reflect the risk involved in maintaining the future earnings potential. In other words, will the license holder be able to consistently maintain the earnings differential to the projected age of retirement?
*249 Mr. Stone testified that the 3% discount rate is the rate realized by the most low-risk investments and “almost a guarantee” that the earnings differential will be realized and will outperform inflation. Ms. Hoffman testified that the 3% discount rate utilized by the Goodman appraisal was based upon the rate approved by the Court of Appeals in O’Brien v O’Brien (66 NY2d 576). In that case, however, the expert’s methodology utilized to value the practice was uncontradicted, and the expert testified that the 3% rate was chosen “to be conservative”. Ms. Hoffman further testified that the 3% represents the value of a risk-free investment such as 20-year United States Treasury bills adjusted for inflation. Both experts acknowledged that there are changes occurring in the medical profession, such as the emergence of HMOs, capitation rates, and the use of psychologists in lieu of psychiatrists, which may affect the future earnings of psychiatrists. The court concludes that plaintiffs future earnings potential does not warrant the “risk-free” 3% discount rate. However, the Cohn appraisal’s use of a 10-12% discount rate is likewise unwarranted, since plaintiff has consistently demonstrated an upwardly progressive increase in income over the last six years and has recently opened her own practice. As set forth in the Cohn appraisal, the 20-year United States Treasury Bond rate of 7% which, according to the Cohn appraisal, “is considered a risk-free rate in business evaluations”, is likewise appropriate to evaluate the risks inherent in plaintiffs profession and the likelihood that she will maintain the earnings differential to age 65.
The court therefore values plaintiffs license and certification at $534,076, using the calculations contained on page 8 in the Cohn appraisal, a retirement age of 65, and a 7% discount rate. The court concurs with both appraisers that the appropriate coverture fraction is 25%. Thus, the value of the marital portion of plaintiffs license is $133,519.
Defendant’s economic and noneconomic contributions to plaintiffs acquisition of her United States license and certification are to be considered in determining defendant’s equitable share in plaintiffs increased earning capacity (Mayeri v Mayeri, 220 AD2d 647). The court must make an award that fairly and adequately reflects a partnership interest of the defendant in plaintiffs license and certification, while recognizing that the acquisition of such an asset is, in large measure, the result of a personal achievement of the plaintiff (Maloney v Maloney, 137 AD2d 666, citing O’Brien v O’Brien, supra).
The testimony at trial was conflicting with respect to defendant’s contributions to plaintiffs acquisition of her United *250 States medical license. Plaintiff contended that defendant never worked after 1987, and never assisted with the care of the parties’ two children, which was attended to by relatives or hired help. Defendant contended he contributed his income to the family, and attended the children. In support of his claims of contribution, defendant testified, without contradiction, that after the marriage:
He sent plaintiff all the papers necessary to take tests that would enable plaintiff to practice medicine in the United States;
He paid the fees for the two examinations and plaintiff’s studies at Kaplan Institute;
He supported the family while plaintiff was studying at the Kaplan Institute;
He drove her to the second licensing test;
He bought clothes for her to wear to job interviews;
When plaintiff had some difficulty obtaining a residency position, he helped her find an externship at Elmhurst Hospital by getting the application, helping her make telephone calls, following up on her applications, and visiting the Mayor’s office;
When he was working, he contributed his income to the family, and would take dinners to plaintiff when she was attending the Kaplan Institute;
He sent money to plaintiff’s relatives in India.
Defendant also contends that plaintiff secured the position at Harlem Hospital as a result of his being advised by a friend that the position was available, and his convincing her to take the position. Defendant testified that during the marriage “most of the time” he did the child care, and was the primary caretaker of the children, both when he was working and when he was not. Defendant testified he did the housework, cleaning, and helped the children with their studies.
Plaintiff acknowledged that defendant helped her with telephone calls, and would call to follow up on her applications for externship and internship, but that in 1982 and 1983, despite her protests, defendant made accusations to her potential employers that she was being discriminated against. Plaintiff testified that in July of 1984, when she started her fellowship, defendant was not supportive, and not helping her financially or with the children. Plaintiff disputes defendant’s contention that he was the primary caretaker of the children, and testified that she hired a babysitter while she was working. Defendant acknowledged on cross-examination that the parties had *251 intermittent babysitters in 1981 and 1982, and that plaintiffs cousin from India resided with them in 1986 and 1987. While plaintiff contends that her cousin did child care and, in fact, also attended to defendant, defendant denies that the cousin did any child care, but did do cooking. Plaintiff testified that she had a babysitter while doing her externship, who worked from 6:30 a.m. to 6:00 or 6:30 p.m.; that while plaintiff was employed in a residency, defendant was not supportive. Plaintiff testified that when the children or babysitter were sick, she had to attend the children, or pick them up at school, since defendant told her it was “woman’s work”. Plaintiffs testimony is supported by the 1985, 1986 and 1988 tax returns which show that the maximum deduction was taken for child care payments to third parties during those years. Plaintiff also testified she gave defendant her check “because he was running all the finances”, and had to beg him for money. Plaintiff testified that she often had to borrow money from coworkers.
While the extent of defendant’s contributions to the household is strenuously disputed, it is not disputed that from the date of plaintiffs entry into the United States in October of 1980 to at least May of 1982 defendant was the sole support of the family. Furthermore, while defendant’s employment from 1981 to 1984 is disputed, defendant’s 1985 and 1986 income was $20,698 and $16,076 respectively. Defendant’s allegations with respect to his efforts to secure positions for plaintiff prior to her attainment of her New York State medical license was undisputed. On the other hand, defendant testified he could not remember where he was employed from 1988 to 1991, and offered no other evidence of either employment or income. Defendant acknowledged that he did not prepare meals for the family, and the evidence indicates that defendant neither sacrificed his career nor assumed a disproportionate share of household work or child care as a consequence of plaintiffs studies and training, and did not work for substantial periods of time after 1984, despite the fact that he has an MBA earned in the United States in 1978, and a law degree from a Pakistani university (see, Duspiva v Duspiva, 181 AD2d 810). The record is likewise barren of any evidence that the parties deferred acquisition of marital assets other than the license which could have been acquired by the parties if the licensed spouse had been employed, rather than pursuing the study and training necessary for the license (Savasta v Savasta, 146 Misc 2d 101). There is no evidence that defendant was disabled prior to *252 November 4, 1992, and thus no satisfactory explanation for defendant’s failure to contribute monetarily to the household in accordance with his abilities after 1984.
Under the circumstances, defendant is awarded a 25% distributive share of the coverture portion of plaintiffs medical license. To avoid a double count of the same income relied upon for the computation of the value of plaintiffs license and her ability to pay maintenance, however, the court is obligated to reduce the value of plaintiffs New York State medical license and certification by the amount awarded in maintenance (McSparron v McSparron, 87 NY2d 275, supra; Wadsworth v Wadsworth, 219 AD2d 410, citing Scheinkman, 1995 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C236B:6, 1996 Supp Pamph, at 46; Procario v Procario, 164 Misc 2d 79). While the court is cognizant of, and has utilized, alternate methods of computation (see, e.g., Rochelle G. v Harold M. G., 170 Misc 2d 808; Cadet v Cadet, NYLJ, Dec. 11, 1996, at 31, col 6 [Sup Ct, Rockland County, Miller, J.]), the court is bound, absent any appellate authority in the Second Department, to utilize the computation method prescribed by the Fourth Department in Reczek v Reczek (239 AD2d 867) as follows:
Marital portion of license valuation: $133,519
Less maintenance: (22,500)
$111,019
Defendant’s distributive percentage: .25
Defendant’s distributive share: $ 27,755
Defendant is thus entitled to a distributive award of $27,755 with respect to plaintiffs United States medical license and certifications.
[Portions of opinion omitted for purposes of publication.]

 The Goodman appraisal also utilized a “two-step” method which resulted in an insignificant difference in valuation, and which has not been considered.